1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   OMAR CEBRERO,                              No.  1:16-cv-00173-DAD-JLT (HC)

12                 Petitioner,                  **FINDINGS AND RECOMMENDATION
                                                TO DENY PETITION FOR WRIT OF**
13          v.                                  **HABEAS CORPUS**

14   S. FRAUENHEIM,                             **[TWENTY-ONE DAY OBJECTION
                                                DEADLINE]**
15                 Respondent.

16

17          Petitioner is currently in the custody of the California Department of Corrections and

18   Rehabilitation serving a sentence of life without the possibility of parole for his conviction of first

19   degree felony murder and kidnapping to commit extortion.  Petitioner presents multiple

20   challenges to his conviction.  The Court finds that the state court's rejection of his claims were

21   not contrary to, or an unreasonable application of, Supreme Court precedent and recommends the

22   petition be **DENIED.**

23   **I.      PROCEDURAL HISTORY**

24          On September 9, 2011, Petitioner was convicted in the Merced County Superior Court of

25   first degree felony murder (Cal. Penal Code § 189), and kidnapping to commit extortion (Cal.

26   Penal Code § 209(a)).  (Doc. 1 at 1.[1])  The jury also found true the special circumstance that the

27   _____

28   [1] Page references are to ECF pagination.

                                                    1

murder was committed in the course of a kidnapping (Cal. Penal Code § 190.2(a)(17)(B)).  (Doc. 1 at 1.)  On May 7, 2012, Petitioner was sentenced to a term of life without the possibility of parole.  (Doc. 1 at 1.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  (LD[2] 12.)  On December 16, 2014, the Fifth DCA issued its opinion affirming the judgment.  People v. Cebrero, 2014 WL 7152594 (Cal.Ct.App. 2014).  Petitioner filed a petition for review in the California Supreme Court.  (LD 16.)  The California Supreme Court denied the petition without comment on March 11, 2015. (LD 17.)

On February 1, 2016, Petitioner filed his petition for writ of habeas corpus in this Court, along with a motion for stay.  (Doc. 1.)  He filed a first amended petition on March 7, 2016, and an amended motion to stay.  (Docs. 14, 15.)  The Court granted the stay on March 10, 2016.  (Doc. 18.)  Petitioner then returned to the state courts and pursued habeas relief at all three levels; all three petitions were denied.  (LD 18-23.)  On March 6, 2017, Petitioner advised the Court that he had exhausted his state court remedies and lodged a second amended petition.  (Docs. 34, 35.)  On March 20, 2017, the Court lifted the stay, ordered the second amended petition filed, and directed Respondent to file a response.  (Doc. 36.)  Respondent filed an answer on October 6, 2017.  (Doc. 50.)  Petitioner filed a traverse on February 5, 2018.  (Doc. 60.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[3]

The prosecution's main witness at trial was Luis Vazquez, an accomplice to the crime. In exchange for his truthful testimony, Vazquez was allowed to plead guilty to the lesser charge of kidnapping and first degree burglary. He was to receive a total term of nine years four months. He was still awaiting sentencing at the time of trial.

Vazquez testified that on October 23, 2007, [FN3] he was living with his family on Sycamore Street in Delhi. At the time, he was 18 years old and his friend Luis Valencia, who was 24 years old, was also living at the home. The house was on the outskirts of town near some almond orchards.

[FN3] All further references to dates will be to 2007 unless otherwise

---

[2] "LD" refers to the documents lodged by Respondent with the answer.
[3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

indicated.

At approximately 8:00 or 9:00 p.m. on the day in question, Vazquez was sitting on his porch when he observed Valencia drive up in an unfamiliar gray (sometimes described as silver) Pontiac followed by Alvaro Reyes driving a red Lexus. Vazquez had met Reyes approximately four months earlier through Valencia. Reyes and Valencia exited their cars and were having a discussion when Vazquez approached and overheard Valencia tell Reyes he "had to call and pick her up." Vazquez asked them what was going on and they replied, "'we got a little thing going on.'" Vazquez understood that they were going to do a favor for Reyes.

Reyes left in the Lexus saying he had to get his truck, a light brown Ford F150 pickup truck. Meanwhile, Valencia told Vazquez "some Mexicans" took a pound of marijuana, and he was going to try to get it back. Vazquez offered to help Valencia because he knew Valencia had been assaulted in the past. He believed at the time that they were going to confront the person, who he later learned was the victim, Rosa Avina, with guns in an attempt to get her to return the marijuana. If she did not have the drugs, they would beat her. Before leaving, Valencia retrieved his rifle and Vazquez retrieved some zip ties, tape, and a flashlight. Vazquez understood that Reyes was going to pick up Avina.

Valencia and Vazquez drove the Pontiac to a house on Clifford in Turlock. Vazquez was familiar with the house as he had been there before to drink and to smoke methamphetamine with Valencia and Reyes. He knew of two men who lived there named "Cheque" and "Mosca."

Upon arriving at the house, Vazquez retrieved some sheets from Cheque and covered the Pontiac at Valencia's request. He also retrieved a plastic gun, which looked real at night, from the trunk. Valencia armed himself with his rifle, while Vazquez retrieved a two-by-four. Subsequently, Vazquez, Valencia, and Cheque congregated in a small tool shed so they would not be seen by Avina when she arrived. They smoked methamphetamine while they waited.

Reyes and Avina arrived in the truck, and the group in the tool shed could hear as the two entered the house. Shortly after they entered, Valencia, Vazquez, and Cheque approached the house with the weapons and flashlights. Vazquez noted it was dark outside and the house had no electricity. Valencia knocked on the door and then pushed it open when someone answered. The men stormed in and instructed everyone to get on the ground. When they entered, Valencia was armed with the rifle and Vazquez had the toy gun and the two-by-four.

There were three people inside the home on Clifford: Reyes, the victim, and Mosca. The victim was on the floor and her hands and feet were being bound by Valencia and Cheque. Additionally, her face was covered with the tape and Valencia was kicking her and telling her to be quiet. Meanwhile, Vazquez held the flashlight and ensured the others remained on the floor. He did this as "part of the show" so the victim would not know she had been set up. Vazquez bound Mosca with zip ties and took him to another room. He returned for Reyes and began pushing him, when Reyes crawled to the other room on his own. Once in the room, Vazquez told Reyes to stay there, but did not restrain him in any way.

While in the house, Valencia took a ring from the victim as well as a small amount of methamphetamine and some papers. Vazquez noted the papers had some kind of police agency or hotline number on them. He relayed this information to Valencia. Valencia asked Vazquez to question the victim about the missing

3

marijuana because Vazquez spoke English. He did so, and the victim replied, "Martha." Valencia told Vazquez to move the Pontiac closer to the door. As Reyes's truck was in the way, Vazquez asked Reyes for his keys. Reyes provided them and Vazquez moved both the truck and the gray Pontiac, backing the Pontiac close to the door. Apparently not satisfied with the location of the Pontiac, Valencia took the keys and moved the car even closer to the house and opened the trunk. Then the three men carried the victim to the trunk of the Pontiac. Valencia closed the trunk, told Vazquez to get into the back seat and lie down, and drove back to their Sycamore Street house.

Upon arriving at the Sycamore house, Valencia told Vazquez to take the rifle back into the house. Approximately five minutes later, Reyes arrived in his truck and got into the Pontiac with Valencia; Reyes told Vazquez he would be right back. The two returned in the Pontiac 15 to 20 minutes later accompanied by Urbano Ortega and defendant. All four men were in the Pontiac. Vazquez explained he had not met either defendant or Ortega prior to the day in question.

Once they arrived, Valencia, Ortega, and Reyes exited the car and stood in a field talking. Defendant hesitated, only exiting the car partway, but joined the group after Valencia said something to him. Vazquez could not hear what Valencia said, but noted Valencia never pointed a weapon at defendant, and to his knowledge Valencia did not have a weapon with him. After approximately one minute, Vazquez approached the group and asked for a cigarette. Valencia told the others how Vazquez had helped at the Clifford house. Ortega said it was "kind of bad" the marijuana was not recovered. Vazquez noted Ortega was doing most of the talking. Based on the situation, Vazquez assumed Ortega and defendant were the drug dealers who owned the missing marijuana.

During the conversation, Vazquez explained the victim just kept telling them "Martha" but they did not find the marijuana, and it was up to the others to decide what to do with the victim. After a while, Valencia said, "'I know what to do'" and instructed Vazquez to get him a bottle. Vazquez retrieved a small plastic soda bottle and brought it to Valencia, who filled it with gasoline. When Valencia returned holding the bottle filled with gasoline, he spoke to defendant and Ortega for approximately 30 seconds and then began walking toward the Pontiac. Ortega joined Valencia, but defendant again hesitated. Noticing this, Valencia went back and said something to defendant and grabbed him by the sleeve; defendant then joined the men in the Pontiac and they left.

Vazquez noted he never heard anyone say they should stop or protest in any way, even after Valencia retrieved the gasoline. He explained he never saw Valencia threaten defendant or raise his voice although he spoke loudly. Valencia seemed irritated when speaking to defendant, although Vazquez explained Valencia seemed irritated throughout the night. Vazquez never saw Valencia with any weapons when the men were talking in the field.

Vazquez explained Reyes had left the group and went to his truck sometime before Valencia obtained the bottle filled with gasoline. Vazquez joined Reyes in his truck when Valencia was talking to Ortega and defendant while holding the gas-filled bottle. Vazquez and Reyes smoked methamphetamine in the truck as Valencia and the others left in the Pontiac.

The Pontiac returned five to ten minutes later. Valencia exited the car, said something to the passengers, then one of the passengers got into the driver's seat and drove off. Valencia joined Reyes and Vazquez in the truck and the men

smoked methamphetamine together. Sometime later, a woman Vazquez knew as Mayra walked up and joined them in the truck. The four went to the Clifford house where they continued to smoke methamphetamine. At the house, Vazquez apologized to Mosca for tying him up. To Vazquez's knowledge the marijuana was never recovered.

Vazquez's recorded interview with the police was played for the jury. He made several statements to the detectives and in prior testimony that were inconsistent with his trial testimony. Vazquez testified he had lied to the police about a number of facts because he was trying to protect his friends.

During that time period, Vazquez was using about a gram of methamphetamine a day and had been awake for two days prior to the kidnapping.

Jesus Cruz testified that on the morning of October 23 he met with the victim so she could sell a ring for him. The two were in Livingston and at one point went to a house with a fountain in front of it and a gray Pontiac parked in the garage. Cruz recalled two men who went by the nicknames "Tornillo" and "Gato" gave them a ride from Livingston to a house in Turlock in the gray Pontiac. Upon arriving at their destination, the victim got into a brief verbal dispute with one of the men before the men left. Shortly thereafter, Cruz saw the victim with a pound of marijuana. Although he denied it at trial, Cruz had previously told a sheriff's deputy in a prior interview that he had seen the marijuana in the trunk of the Pontiac on the day in question. Cruz never saw the men again. Cruz and the victim proceeded to walk around Turlock, going to a few different houses, and then returned to the home where they had been dropped off. At the home, they smoked methamphetamine with several other people.

Later that evening the victim said she was going to the store and was picked up by a Hispanic male driving a brown Ford F150 truck. The victim briefly argued with the driver but ultimately left with him. Cruz attempted to go with her, but she told him to stay there. He recalled he had tried to open the door to the truck, but it was locked by the driver. Cruz never saw the victim again.

On the morning of October 24, Merced Sheriff's Deputy Frank Swiggart responded to the report of a person in some bushes in a rural area of Merced County. When he arrived, he discovered the victim, severely burned and with her arms and legs bound as well as plastic wrapped around her head. The victim asked several times if she was alive.

Detective Charles Hale was notified regarding the discovery and responded to the scene. He observed the victim had skin hanging from her body due to the burns, blisters oozing a white substance, and foam coming from her mouth. She appeared to be in extreme pain. Hale interviewed the victim, but due to her condition, it was very brief. The interview was recorded and played for the jury.

The victim told Hale she had been picked up by a man named Alvaro, who was driving a gold truck, and he took her to a house in Turlock. She further relayed that while at the house someone knocked, then men barged into the house with guns, tied her up, and put tape on her face. She did not know who had done this to her. Hale observed the victim's face was covered with tape. There was a distinctive pattern on the tape.

After interviewing the victim, Hale discovered the area where the victim was burned, which was approximately seven-tenths of a mile away in a nearby orchard.

At the scene, deputies located a boat that was still smoldering, a plastic soda bottle that smelled of gasoline, and shoe prints. The shoe prints were photographed for comparison. He subsequently observed similar shoe prints at the Sycamore Street residence.

Detective Corey Gibson testified that after learning from the victim she had been picked up by Reyes, officers conducted surveillance on Reyes's home. Reyes was contacted and interviewed by detectives. They learned he owned a brown Ford F150 pickup truck. Reyes took the detectives to the location where he had picked up the victim on the night of the kidnapping. He also directed officers to the Sycamore Street house and pointed out Valencia. Valencia was arrested at the Sycamore house. The Sycamore house is approximately four and one-half miles from the location where the victim was burned.

The following day, Reyes directed officers to the Clifford house. Additionally, Reyes directed the detectives to defendant's home on Hammatt Avenue in Livingston, explaining defendant was "responsible for" the victim's death. The home had a fountain in front and a silver Pontiac parked outside. The car was registered to defendant. The car was later processed for fingerprints and the only identifiable print found belonged to defendant. The fingerprint analyst noted the car was "extremely clean." Blood was found in the trunk of the Pontiac. Genetic testing on the blood revealed the blood belonged to the victim. Ronolfo "Tornillo" Ortega,[FN4] Urbano Ortega's brother, also lived there. Reyes lived approximately one and one-half blocks from defendant.

> [FN4] To avoid confusion, we will refer to Ronolfo Ortega as "Tornillo." No disrespect is intended.

On October 27, Hale assisted in the service of a search warrant at the Clifford house in Turlock. Officers discovered zip ties and the same distinctive tape used on the victim. A search warrant was served on the Sycamore home on October 26. There officers found a loaded rifle, and a handle with tape matching the distinctive tape used on the victim. On November 2, officers searched Ortega's home and seized a total of three shoes.

The victim died on October 26 as a result of multisystem failure caused by her extensive thermal burns. Dr. Robert Lawrence, the pathologist who performed the autopsy, noted the victim had a pattern of burns on her body consistent with her being splashed with an accelerant. The burns covered approximately 60 percent of her body and were focused on the front and back of her upper body. The victim also had burns in her airway, indicating she had inhaled flames. He described her injuries as "excruciatingly painful" and resulted in the loss of 60 percent of her skin. Had she survived, she would have been permanently disfigured. At the time she was admitted to the hospital, the victim had toxic levels of methamphetamine in her system.

Items of evidence, such as pieces of recovered tape and the plastic bottle, were processed for prints, however, none of the suspects' fingerprints was found. Testing of the victim's clothing revealed traces of gasoline.

After Valencia's arrest, officers monitored jail calls between Valencia and his wife. During one of the calls, Valencia told his wife that he had dropped a ring and buried it when he was arrested. In another call, Valencia's wife indicated someone was able to recover the ring. Officers later contacted Valencia's wife and seized the ring. Both Jesus Cruz and Vazquez identified the ring as the one taken from the

victim.

Merced Sheriff's Deputy Raymond Framstad testified as an expert regarding marijuana. He noted a pound of marijuana was worth between $600 and $1,000 in 2007. However, if the marijuana was a type having a high THC (tetrahydrocannabinol) content, it could be worth up to $6,000 a pound. A person dealing in marijuana was likely to have some indicia of the business such as pay/owe sheets or large amounts of money. Framstad described "mules" as persons who transport drugs for someone else. They are typically paid for their services.

Detective Alex Barba learned through the course of investigating this case that several suspects were known by nicknames. Specifically, he learned defendant used the nickname "Gato," Valencia used the nickname "Primo," and Ortega used the names "Oaxaco," [FN5] and "Juan." Officers also determined that at the time of the crime defendant was 18 years old, Valencia was 24 years old, and Ortega was 27 years old.

> [FN5] Defendant identified Ortega by the nickname "Oaxaca."

Detective Barba interviewed defendant on November 2. A recording of defendant's interview with Barba was played for the jury. Defendant acknowledged he used the nickname "Gato." He was informed of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 and waived them. He admitted giving the victim and a man a ride to Turlock on the day in question and dropping them off at a house. He claimed that was the last time he saw her. Detectives confronted defendant with their knowledge that he had given the victim marijuana to sell. Defendant claimed the marijuana did not belong to him but rather a friend, Tornillo. He knew the victim had left the marijuana at a different house where someone named Martha lived. He asked the victim about the money for the marijuana but she said she would get it later and defendant asked her to take it directly to Tornillo. The victim owed Tornillo the money for the marijuana, although she also owed defendant $150 of the proceeds.

Defendant admitted the victim had failed to pay him in the past and she owed him a debt of $60 for a prior methamphetamine transaction. Additionally, she owed another $100 for the marijuana at issue. Defendant admitted he knew Reyes, but denied speaking to him the night of the crime, claiming Ortega spoke with him.

Initially, defendant denied any knowledge relating to anything after he dropped off the victim. Instead, he claimed he was home with his parents all night. After the detectives explained they had already spoken to numerous people and knew what had happened, defendant indicated he did not want to talk because he was afraid for his safety.

He then admitted he saw Ortega and Reyes talking on the day in question and heard them say they could not leave things the way they were. Reyes said he knew someone who could do them a favor. Defendant did not know what that meant, but thought it could mean they would kill the victim. Reyes left and was going to pick someone up. Reyes and Ortega left and later Tornillo arrived and asked what happened. Subsequently Ortega told him they had burned the victim. Defendant continued to deny his involvement and claimed he was not present when the victim was burned.

Defendant explained the victim owed money to both Ortega and Valencia. Tornillo

told Ortega the victim had not paid for the drugs. After additional questioning, defendant admitted he was present when Ortega found out the victim had not paid for the drugs. Ortega became angry and said the victim had "done him wrong" before, so he called Reyes for a favor. Reyes said he knew someone who could do the favor, and Reyes and Ortega left to meet Valencia. He was later told that Reyes picked up the victim, and Valencia and some others made it look like Reyes was not in on it. Defendant claimed Ortega later told him the victim owed them money and he did "what had to be done." Ortega said he and Valencia took the victim somewhere, and Valencia poured gasoline on the victim and Ortega lit her on fire.

Defendant ultimately admitted Tornillo gave the victim a pound of marijuana to sell for him for $900 to $1,000. Defendant took the victim and the marijuana to a house but the victim did not remit any payment, instead saying that Martha was going to pay her later. After getting this information, defendant dropped the victim off at another house and left.

Sometime later, defendant loaned Ortega his car to give someone a ride. When Ortega returned, defendant asked where his car was. Ortega told defendant to come with him to the "Westside," and as they were walking to the car, Ortega told him what had happened. It was then he found out Ortega had given the car to the others to kidnap the victim.

Once they arrived at the Westside location, defendant noticed Valencia in the car with two others. Ortega said something and Valencia told him not to talk because the victim might recognize his voice. Defendant asked what was going on, and Valencia told him to "shut up mother fucker." They all got into the car and Valencia took them to a field where Valencia interrogated the victim regarding the location of the drugs. She said the drugs were at Martha's house. Defendant noted the victim was already bound when she was removed from the trunk. Valencia did the talking in the field because he did not want the victim to recognize anyone's voice. At some point, defendant asked what they were doing and Valencia told him not to say anything or the same thing or worse was going to happen to him.

Subsequently the men gathered together and were talking. Ortega called defendant over and Valencia got mad at Ortega, questioning him as to why he brought more people into the plan. Ortega told Valencia that defendant owned the car they were using, and Valencia told defendant that if he said anything the same or worse was going to happen to him. The men discussed the fact the victim no longer had the marijuana. Additionally, Valencia had discovered some papers on the victim indicating she was cooperating with the police. Then they all got back in the car and left.

They dropped off Reyes at a gas station because he did not want to go with them, although defendant claimed they had no specific plan at that point. They continued driving until Valencia pointed out a good spot. Valencia backed the vehicle in, and he and Ortega got the victim out of the trunk. They put her in a boat, Valencia poured gas on her, and Ortega lit her on fire. Defendant waited by the car. The victim was screaming and jumping about. The men left. Valencia drove them away and said no one "better say anything."

Defendant claimed that when he found out the victim was in the trunk of his car he became upset, and Valencia told him not to say anything "'because if you do, you're gonna be next.'" When asked why he left the victim on fire in the field, defendant replied he did so because Valencia asked him if he was "going to get in or do you want to stay with her." Defendant recounted that Valencia said at some

point that if it was up to him he would have done the same to defendant because the less people who knew about what happened the better. But Ortega intervened and told him not to do anything. Defendant recounted that he was afraid because Valencia told him if he said anything the same or worse would happen to him.

Barba contacted defendant again on November 7 at the detention facility. Defendant expressed fear regarding Valencia, and the detective instructed the staff to keep the two men separated. Defendant also provided Barba with information regarding a "stash" house where deputies later recovered 50 to 55 pounds of marijuana. Barba believed defendant provided the information to help the deputies.

Joel Esparza was in custody at the detention facility in July of 2008 for auto theft, possession of methamphetamine, and driving under the influence. In January of 2009, defendant and Esparza were cell mates. During the time the two men were housed together, Esparza sought to speak with law enforcement regarding defendant. Ultimately he spoke with Detectives Hale and Gibson on January 27, 2009. Esparza testified defendant had offered to give him a gray Pontiac Grand Prix in exchange for giving a false statement. According to Esparza, defendant wanted him to give him an alibi for the offense. Specifically, he was to state that defendant did not have his car on the night of the incident; rather, Tornillo had taken the car and not returned it.

Esparza also testified defendant had made admissions to him regarding his knowledge of the kidnapping. Defendant told Esparza that the owners of the drugs had met him at a gas station and attempted to hold him responsible for the disappearance of the drugs. This was because he had given the victim a ride and the victim had absconded with the drugs. The men had asked him to loan them his car, and they were going to get their drugs back from the victim. Defendant was told he had to drop off the car at a supermarket with the keys so the others could kidnap the girl. Defendant claimed he did not know what was going to happen but let the others borrow the car; after he learned of the kidnapping, he went along with them because he was worried he would end up like the victim. He further explained that Reyes and Valencia were involved in the plan and were the ones that picked up the car.

Defendant explained that Ortega changed the tires on the Pontiac both before and after the kidnapping to avoid leaving tread marks matching his car's. Defendant also made admissions regarding his participation after the victim was kidnapped. Specifically, he stated that he helped remove the victim from the car in the field, but he not did participate in burning her. He said he helped because he did not want to end up in the same position as the victim. After the crime, he and Ortega thoroughly cleaned the car.

Defendant explained he had told the police he only helped because he had been held at gunpoint and was afraid for his life. He said this because he had no other way of explaining his presence. He further asked Esparza to take his shoes out of the property room so the police would not link his shoeprints to the crime scene.

Esparza provided this information in the hope of securing a plea on his pending cases. He was given use immunity for his testimony; however, he did not receive any plea agreement for his pending crimes. Esparza had several prior convictions, including corporal injury to a spouse, assault, possessing a dangerous weapon, giving false information to a peace officer, receiving stolen property, petty theft with a prior, and automobile theft.

9

1

*Defense Case*

2    Claudia Jaes, defendant's sister, testified her brother was living with her on Olive
3    Avenue in Turlock in November of 2007. He had been living with her for
     approximately one month. She stated Esparza had never given her any written
4    statement regarding her brother, although he had mentioned he had a way to help
     her brother get out of jail. Esparza stated he would need a lot of money to get him
     out of jail, but Jaes never gave him anything.

5

6    Cebrero, 2014 WL 7152594, at *1–8.

7    **III.    DISCUSSION**

8    A.    Jurisdiction

9        Relief by way of a petition for writ of habeas corpus extends to a person in custody

10   pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

11   treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

12   529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as

13   guaranteed by the United States Constitution. The challenged conviction arises out of the Merced

14   County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. §

15   2254(a); 28 U.S.C.§ 2241(d).

16       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

17   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

18   enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

19   filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA

20   and is therefore governed by its provisions.

21   B.    Legal Standard of Review

22       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

23   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

24   that was contrary to, or involved an unreasonable application of, clearly established Federal law,

25   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

26   based on an unreasonable determination of the facts in light of the evidence presented in the State

27   court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

28   Williams, 529 U.S. at 412-413.

10

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

1        The prejudicial impact of any constitutional error is assessed by asking whether the error

2    had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

3    Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

4    (holding that the Brecht standard applies whether or not the state court recognized the error and

5    reviewed it for harmlessness).

6    C.    Review of Petition

7        The instant petition presents the following grounds for relief: 1) The trial court denied

8    Petitioner his due process rights under the Sixth and Fourteenth Amendments by failing to

9    instruct on the defense theory of duress; 2) Defense counsel rendered ineffective assistance by

10    failing to object to the admission of hearsay; 3) The trial court erred in its instructions on post-

11    crime conduct; 4) Defense counsel was ineffective in failing to request a limiting instruction; 5)

12    The evidence was insufficient to sustain the kidnapping special circumstance; 6) The trial court

13    violated Petitioner's due process rights by giving the jury conflicting instructions on the mental

14    state element of the kidnapping special circumstance; 7) The trial court erred in its instructions on

15    motive; 8) Petitioner's due process rights were violated by the presentation of false evidence; and

16    9) Defense counsel was ineffective in prohibiting Petitioner from testifying at trial on his own

17    behalf.

18        1.  Failure to Instruct on Duress

19        In his first claim, Petitioner alleges his due process rights were violated when the trial

20    court failed to instruct the jury on the defense theory of duress.  Petitioner raised this claim on

21    direct appeal in the state courts.  The Fifth DCA rendered the last reasoned decision, as follows:

22        Defendant argues the trial court erred in failing to instruct the jury, sua sponte, on
        the defense of duress. He claims the evidence was sufficient to establish his

23        participation in the kidnapping of the victim was motivated by fear that Valencia
        would harm him if he did not participate. We find no error.

24
            An instruction on duress is only required where there is substantial evidence to
25        support a finding the defendant charged with a crime reasonably and actually
        believed his or her life was immediately threatened if he or she refused to
26        participate. (§ 26; *People v. Wilson* (2005) 36 Cal.4th 309, 331.) Duress is not a
        defense to murder, however, "duress can, in effect, provide a defense to murder on
27        a felony-murder theory by negating the underlying felony. [Citations.] If one is not
        guilty of the underlying felony due to duress, one cannot be guilty of felony
28        murder based on that felony." (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) A

12

court has a sua sponte duty to instruct on a defense where there is substantial evidence to support the defense and the defense is not inconsistent with the defendant's theory of the case. (*People v. Salas* (2006) 37 Cal.4th 967, 982; *People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)

"In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas, supra,* 37 Cal.4th at p. 982, quoting *People v. Jones* (2003) 112 Cal.App.4th 341, 351.) However, the "test is not whether any evidence is presented, no matter how weak." (*People v. Petznick* (2003) 114 Cal.App.4th 663, 677.)

An essential component of the duress defense is that "the defendant be faced with a direct or implied demand that he or she commit the charged crime." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 567.) Indeed, "the defense of duress is available only to those 'who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.'" (*People v. Perez* (1973) 9 Cal.3d 651, 657.) Accordingly, the defense of duress requires evidence that the defendant participated in the crime as a result of a present and active threat of imminent danger. (*People v. Petznick, supra,* 114 Cal.App.4th at pp. 676–677.) Such demand is missing in this case. Although defendant told the detectives he was afraid and claimed Valencia had threatened to treat him in the same manner as the victim if he spoke, there was no evidence of an accompanying demand that he participate in the crime.

Defendant argues to the contrary in his brief, claiming that upon learning the victim was in the trunk of the car, "Valencia told him 'shut up, mother fucker,' threatening that [defendant] was either 'gonna get in the car [with them] or ... gonna be like her' and that 'the same thing was going to happen to [him as to Avina] or worse.'" However, the record does not support this assertion. It is true defendant told the detectives that upon meeting Valencia at the car with the victim in the trunk, he spoke and was told to "shut up" by Valencia. However, defendant never told the officers that Valencia threatened him with any harm if he did not join them in the car. Rather, he explained he had been told to be quiet so the victim would not recognize his voice, and when he tried to ask a question, he was again admonished to remain silent or the same thing would happen to him. It is clear from defendant's statement that any threat made by Valencia was a threat to remain quiet, not a threat to either enter the car or to participate in the ensuing activities.

At the end of his interview, defendant stated Valencia did tell him, " 'Are you going to get in, or do you want to stay with her.' " However, this statement was made after the victim had been removed from the trunk and burned and as the men were leaving the scene. Thus, any implied threat contained in that statement again was not a threat to participate in the crime, which at that point was complete. Furthermore, we question whether the statement itself contained any threat. Defendant recounted the statement as quoted above. There was no reference in defendant's statement indicating defendant would be treated in the same manner as the victim if he did not enter the car. Rather, it was Detective Barba who added the threat when he relayed the statement to the other detective in the room. Barba, who was translating the interview, told the other detective defendant had said, "Are you gonna get in the car or are you gonna stay with her and be like her."

Although defendant relayed several additional threats, each threat was related to either him speaking at the scene in the presence of the victim, or telling others about the crime. None of the threats defendant recounted contained an accompanying demand that he participate in the crime in any way.

The case is similar to *People v. Saavedra, supra*, 156 Cal.App.4th 561. There the defendant, an inmate, was convicted of possessing a weapon in prison. The evidence established he had been attacked by two other prisoners. Guards intervened and stopped the attack. The defendant was taken to the hospital to be treated for his wounds. While there, an officer found an inmate-manufactured weapon in the defendant's shoe. The defendant testified he had picked up the weapon after one of his assailants dropped it during the attack. He was worried that if he did not retrieve the weapon, his assailant would use it to kill him. (*Id*. at pp. 565–566.) On appeal, the defendant claimed the court erred in failing to instruct the jury on the defense of duress. The court disagreed, explaining there were no facts demonstrating the defendant's attackers demanded he pick up the weapon. Therefore instructions on duress were not warranted. (*Id*. at p. 567.)

Likewise in *People v. Steele* (1988) 206 Cal.App.3d 703, 705–707, duress instructions were properly refused as a defense to escape where the defendant argued he only attempted to escape because other inmates had threatened to stab him. Because there was no indication the people making the threats demanded the defendant escape, there was no substantial evidence of duress. (*Id*. at p. 707.)

Here there was no substantial evidence Valencia made any immediate threat to defendant that forced him to participate in the crime. Rather, each threat defendant relayed to the officers concerned consequences for either speaking when the victim could hear his voice or telling others about the crime. For example, defendant recounted that after Valencia had told everyone not to talk because he did not want the victim to recognize their voices, defendant asked what they were doing and Valencia told him "shut up mother fucker" and said if he said anything the same thing or worse was going to happen to him. While one could imply a threat from this statement, it was not a threat to participate; rather it was a threat regarding not speaking. Likewise, Valencia's threat not to say anything "because if you do, you're gonna be next" threatened defendant with consequences if he spoke about the crime, it did not contain a demand that he participate. No threat recounted by defendant during his interview was accompanied by a demand to participate in the crime. Indeed, during the interview defendant maintained he did not participate in the crime at all, he did not know about the plan to kidnap the victim, he had not loaned his car to the others for the purpose of the kidnapping, and he was merely a bystander throughout the ordeal. He never claimed, as is required for the defense of duress, that he participated under a threat to his life.

Furthermore, defendant presented no evidence he ever saw Valencia with a gun or any other weapon. To the contrary, the evidence established Valencia had Vazquez put the rifle back in the house after Valencia kidnapped the victim and before he picked up defendant. Vazquez testified that although defendant hesitated in both exiting and reentering the car, he never heard Valencia threaten defendant nor did he ever see Valencia with a weapon or point a weapon at defendant. On this fact, the case is similar to *People v. Wilson, supra*, 36 Cal.4th 309. There, the court found no substantial evidence of the defense of duress where the defendant testified his cohort pointed a gun at him and told him to drive just after killing the victim. Because the defendant's testimony established he never saw his cohort with a gun, and the defendant had admitted to the police that he and his cohort had planned the robbery and murder, the defense of duress was inapplicable. (*Id*. at pp.

331–332.) Likewise here, defendant never testified he saw Valencia with a weapon, he admitted knowing Reyes and Ortega were planning something relating to the victim, and he never claimed there was any direct threat regarding his participation. While defendant did state several times he was in fear for his life, he claimed his fear was related to speaking about the crime to the detectives.

Although Vazquez's testimony comes closer to establishing a defense of duress, it still was missing a necessary element, namely any threat. Vazquez merely testified Valencia said something to defendant and he joined the group. However, Vazquez could not hear what was said and he never saw Valencia threaten defendant with any sort of weapon. The necessary threat could not be implied from defendant's statement to police, as defendant only relayed that Valencia threatened him with future harm if he told anyone about the crime. A "'phantasmagoria of future harm' such as a threat of death to be carried out at some undefined time, will not diminish criminal culpability." (*People v. Petznick, supra,* 114 Cal.App.4th at pp. 676–677.) Defendant never relayed any threat requiring him to participate in the crime. Rather, he contended throughout his interview that he was only present and did not participate in any way regarding the kidnapping or murder.

Furthermore, Vazquez's testimony that defendant "hesitated" or appeared nervous, and his observation that Valencia raised his voice toward defendant and appeared irritated, at one point leading defendant by the sleeve, does not supply the missing threat. At most, this evidence established defendant was reluctant to participate, however, such reluctance "is not enough to support a finding that he participated in the crimes as the result of a present and active threat of imminent danger." (*People v. Petznick, supra,* 114 Cal.App.4th at p. 677.)

Nor did Esparza's testimony provide the missing threat. Esparza testified defendant told him he loaned the others his car because he did not want to be held responsible for the theft of the drugs. However, nothing in Esparza's testimony established defendant was threatened in any way. Although Esparza testified briefly that defendant had told him he told the police he only got into the car because he had been threatened at gunpoint, Esparza explained defendant only said that "because he had no way of explaining to [the police] that he was in the vehicle other than that he was put in at gunpoint in fear of his life." Esparza never testified defendant actually told him he was held at gunpoint and was in fear for his life. More importantly, it is evident from defendant's recorded statement that he never told the police he had been held at gunpoint. Thus, this single statement was insufficient to raise the defense of duress.

Likewise, Esparza's testimony that defendant told him he loaned his car and went along with Valencia and Ortega because he did not want to be in the same position as the victim was insufficient to raise the defense of duress. Nothing in that testimony established defendant was told his failure to participate would result in his *immediate death*. Rather, defendant expressed he did not know what was going to happen to the victim. No evidence was presented to the jury that defendant subjectively believed his being held responsible for the theft of the drugs meant he would be killed or that he was told he had to participate. Indeed, much of the testimony at trial was introduced to show the perpetrators wanted to get the drugs back, and the decision to kill the victim was not made until well after she was kidnapped and they were unable to recover the drugs. Additionally, defendant continually professed to the officers that he did not know what was going to happen to the victim. To establish duress, there must be evidence defendant both subjectively believed there was an immediate threat to his life, and that belief was objectively reasonable. (*People v. Condley* (1977) 69 Cal.App.3d 999, 1011–

1012.) The evidence here failed to demonstrate any belief that defendant's participation was required under the threat of immediate death.

In *People v. Petznick, supra*, 114 Cal.App.4th 663, the defendant was convicted of conspiracy to commit murder, murder, and murder in the course of a robbery. Although he never presented evidence of a direct threat, he argued a duress instruction was necessary from evidence indicating he was reluctant to engage in the crime. Furthermore, the defendant argued that evidence establishing his coperpetrators had committed a previous murder led to the inference that he only participated in the crime because he feared for his life. (*Id.* at p. 677.) The court rejected the defendant's argument, noting there was no evidence of a threat to his life if he did not participate in the crime. Evidence of his reluctance to participate in the crime did not support a finding that his participation was the result of a threat to his life. (*Ibid.*)

In determining whether a duress instruction should be given, the test "is not whether any evidence is presented, no matter how weak." (*People v. Petznick, supra*, 114 Cal.App.4th at p. 677.) Instead, a duress instruction must be given only "when there is evidence that 'deserve[s] consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded"' that the specific facts supporting the instruction existed." (*Ibid.*) Here, without any evidence defendant's life was threatened if he did not participate in the crime, his claim that his reluctance to participate was the result of such a threat is pure speculation. Therefore, the failure to give an instruction on duress was not error.

Cebrero, 2014 WL 7152594, at *8-12.

a.  Legal Standard

Initially, the Court notes that a claim that a jury instruction violated state law is not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434–35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect

self-defense defining "imminent peril" where three other instructions correctly stated the law).

Moreover, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155. Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997) (quoting Henderson, 431 U.S. at 155), cert. denied, 522 U.S. 1079 (1998). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.2001) (quoting Henderson, 431 U.S. at 156), cert. denied, 535 U.S. 935 (2002).

In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see Calderon v. Coleman, 525 U.S. 141, 146–47 (1998).

Because due process requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense[,]" California v. Trombetta, 467 U.S. 479, 485 (1984), a criminal defendant is entitled to adequate instructions on the defense theory of the case, Conde v. Henry, 198 F.3d 734, 739 (9th Cir.2000), "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." United States v. Boulware, 558 F.3d 971, 974 (9th Cir.), cert. denied, 558 U.S. 1048 (2009). The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir.1996).

b. Analysis

Petitioner's claim does not merit relief. He fails to establish that the trial court's failure to instruct on duress was a violation of California law, let alone an error of constitutional magnitude. As noted by the appellate court, in California, the duress defense requires a showing that "the defendant be faced with a direct or implied demand that he or she commit the charged crime."

17

People v. Saavedra, 156 Cal.App.4th 561, 567 (2007). There must be evidence that Defendant committed the act under a threat of imminent danger to his life if he did not comply. People v. Perez, 9 Cal.3d 651, 657 (1973). In this case, there was no evidence of a threat, direct or implied, of imminent danger to his life if he failed to participate in the crime. Petitioner was threatened by Valencia, but the threats were made so that Petitioner would not tell others about what occurred or that Petitioner not speak at times when the victim could hear his voice. No threat was ever mentioned that Petitioner had to participate in the crime or he would suffer imminent harm. In fact, Petitioner's own statements to the police show the opposite. Petitioner maintained that he did not participate at all, and that he was merely present during the events. Thus, the state court was not unreasonable in determining that the trial court did not err in failing to *sua sponte* instruct on duress.

More importantly, Petitioner fails to demonstrate a constitutional violation. While the defendant is entitled to a reasonable opportunity to present a defense, the Supreme Court has not squarely held that a trial court is required to give specific instructions irrespective of whether the defendant requested them. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Absent controlling Supreme Court precedent, habeas relief is foreclosed. Richter, 562 U.S. at 101. Accordingly, Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court authority.

### 2. Ineffective Assistance of Counsel

Petitioner next contends that defense counsel was ineffective in failing to object to the admission of hearsay. In particular, Detective Gibson had testified that Reyes had told him that Petitioner was responsible for the victim's death. Petitioner claims that counsel's failure was prejudicial and denied him a fair trial. This claim was also raised on direct appeal. The Fifth DCA rejected the claim as follows:

> Defendant argues his counsel was ineffective in two respects. He claims his trial counsel's failure to object to hearsay testimony and his failure to request a limiting instruction regarding the use of Vazquez's testimony constituted prejudicial error. We disagree.
>
> "Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the

18

assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To establish ineffective assistance of counsel, "'a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant....'" (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) To establish prejudice, a defendant must demonstrate there is a reasonable probability the result would have been more favorable had his counsel provided adequate representation. (*Strickland v. Washington* (1984) 466 U.S. 687, 694; *People v. Bolin* (1998) 18 Cal.4th 297, 333.)

Defense counsel's failure to object rarely establishes ineffective assistance. (*People v. Avena* (1996) 13 Cal.4th 394, 444–445.) "[W]hen the reasons for counsel's actions are not readily apparent in the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the appellate record discloses "'no conceivable tactical purpose"' for counsel's act or omission." (*People v. Lewis, supra*, 25 Cal.4th at pp. 674–675; cf. *People v. Ray* (1996) 13 Cal.4th 313, 349 ["In order to prevail on (an ineffective assistance of counsel) claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission"].)

**A. Failure to object to hearsay testimony**

Defendant argues his trial counsel was ineffective for failing to object to hearsay testimony. We disagree.

During the People's case-in-chief, Gibson testified that after detectives spoke with the victim briefly, they began looking for Reyes. The officers conducted surveillance on his home that evening and contacted Reyes the following day. Gibson related that later that evening Reyes pointed out the location where he picked up the victim as well as the Sycamore house where, he noted, the officers could find Valencia. The following day, the detectives contacted Reyes again and Reyes identified the Clifford home where the victim was kidnapped. After providing this information, the following exchange took place:

> "[Prosecutor:] Q. Okay. After you located that residence, did ... Reyes provide you with any other information?
>
> "[Gibson:] A. Yes.
>
> "Q. What did he provide you with?
>
> "A. After leaving that location, he told me that the person responsible for [the victim's] death was a guy by the name of Omar and that he lived on Hammatt down the road from him.
>
> "Q. Okay. Did [Reyes] take you to the residence where you could find Omar?
>
> "A. Yes.
>
> "Q. And which residence did he direct you to?
>
> "A. He took me to ... Hammatt in Livingston."

The prosecutor went on to elicit testimony that the home had a fountain in front of

it and when the officers drove by there was a silver Pontiac registered to defendant parked in front of the house. Defendant argues his trial counsel should have interposed an objection to the testimony relaying that Reyes stated "the person responsible for [the victim's] death was a guy by the name of Omar" as it constituted inadmissible hearsay and was prejudicial to the defense.

When asserting trial counsel's inaction resulted in ineffective assistance of counsel, a defendant "must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Floyd* (1970) 1 Cal.3d 694, 709, overruled on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162, 165.) In reviewing a claim of ineffective assistance of counsel, we give great deference to trial counsel's reasonable tactical decisions. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) Indeed, our Supreme Court has cautioned we "'should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.'" (*Id*. at p. 926.) An ineffective assistance of counsel claim will not be upheld where the record does not reveal counsel's reasons for his failure to act unless there could be no conceivable reason for counsel's inaction. (*People v. Earp* (1999) 20 Cal.4th 826, 896.)

The statement at issue here could be deemed hearsay as it relayed an out-of-court statement made by Reyes, who did not testify. (Evid.Code, § 1200, subd. (a).) Even if we were to assume there was no applicable hearsay exception, we must evaluate the record to determine whether there was a reasonable tactical purpose to forgo an objection to the statement. As our Supreme Court has explained, counsel may choose to forgo an objection to testimony to avoid highlighting the testimony and making it appear more significant. (*People v. Williams* (1997) 16 Cal.4th 153, 215.) We find such a tactical reason present here.

Gibson's testimony regarding Reyes's statement was very brief. Indeed, it consisted of a single sentence among approximately eight days of testimony. The statement itself was also somewhat ambiguous in that it stated defendant was "responsible" for the victim's death. The prosecutor did not ask any followup questions regarding the statement nor seek additional testimony on the subject. Given the brief and ambiguous nature of the statement, trial counsel may well have decided to forgo any objection to it rather than call more attention to the statement and possibly alert the jury to an alternative meaning. We cannot find such a tactical decision in this circumstance to be unreasonable.

Furthermore, counsel could have decided that making an objection to the statement could have caused the prosecution to lay additional foundation for its admission. (Accord, *People v. Dennis* (1998) 17 Cal.4th 468, 532 [failing to object to hearsay statement did not constitute ineffective assistance of counsel as an "objection might only have prompted the prosecutor to establish a fuller foundation for admitting the statements, thus strengthening the witness's credibility"].) As the People point out, the statement itself could have been, and likely was, offered for a nonhearsay purpose. A statement not offered for the truth of the matter asserted, but rather offered for another purpose such as explaining a witness's actions, is not hearsay. (Evid.Code § 1200, subd. (a); *People v. Ervine* (2009) 47 Cal.4th 745, 775–776 [statements relayed to officers by dispatcher and victim were admissible to explain officer's actions and did not constitute hearsay].) Likewise, a statement not offered for its truth is not testimonial in nature, and its admission would not offend the confrontation clause of the federal Constitution. (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9.)

Here, the statement was elicited through testimony that can only be characterized as foundational. The prosecutor questioned Gibson regarding actions the officers took after speaking with Reyes. In fact, the testimony preceding and following the statement related to Reyes providing information regarding the location of the crimes committed and the people involved. The prosecutor questioned Gibson about Reyes providing the location where he initially picked up the victim, the location from which she was abducted, the location of the Sycamore home where Valencia could be found, and the location of defendant's home. Immediately after Gibson testified Reyes had told him "the person responsible for [the victim]'s death was a guy by the name of Omar and that he lived on Hammatt down the road from him," the prosecutor asked whether Reyes pointed out that location. Notably, the prosecutor did not question Gibson about the content of the statement. Each of the followup questions related to going to the house on Hammatt, describing the house, discovering the vehicle used in the kidnapping, and determining the vehicle was registered to defendant.

Given the context under which the statement arose as well as the fact that the prosecutor never tried to elaborate on the statement or elicit any additional testimony regarding the statement, counsel simply could have chosen to forgo any objections to the statement so as to not give it additional importance. That the prosecutor never mentioned the statement in any way during closing arguments as evidence of guilt further suggests the context in which it arose was simply foundational. Under these circumstances, it appears the testimony itself was offered for a nonhearsay purpose. Defense counsel could have reasonably understood this purpose and chose not to object or ask for any limiting instruction so as not to call attention to the statement itself. Because we can conceive of a reasonable tactical decision to not object to the statement, we must conclude the failure to object to the single statement did not constitute ineffective assistance of counsel.

Even if we were to assume there was no tactical decision to fail to object, we find defendant has not demonstrated prejudice. As we have already explained, the statement, made in context appeared to be foundational. The statement itself was quite brief and ambiguous in nature. Although the main issue at trial was whether defendant harbored the intent to facilitate the kidnapping, the statement that defendant was "responsible" for the victim's death did not have a strong bearing on defendant's intent. The statement could have meant defendant was the person who actually killed the victim, that he did something that led to her death, or that he set the sequence of events in motion. It was undisputed at trial that defendant was not the actual killer. Rather, the prosecutor argued there was "no evidence that [defendant] lit [the victim] on fire, that he put the gasoline on her. So I submit to you that there's no evidence that he is the man who actually caused [the victim's] death." Instead, the People argued defendant was guilty based upon an aiding and abetting theory that he assisted in the kidnapping that led to the murder. The People argued the missing marijuana belonged to defendant; he was the one who wanted the drugs back. Defendant's car was used in the kidnapping, and defendant admitted his presence in the vehicle while the victim was in the trunk, his presence when the others discussed what to do next, and his presence at the scene. In light of the above, the fact the officer relayed that Reyes stated defendant was "responsible" for the victim's death merely related to the fact defendant dropped off the victim with the marijuana without receiving payment.

While one could infer defendant's responsibility meant defendant played some sort of a role in the victim's death, the other evidence at trial established as much. Indeed, defendant admitted he was the one who dropped off the victim and the

21

marijuana and that she did not pay him. No evidence was admitted elaborating on this statement, nor were there any followup questions on the subject. Rather the testimony constituted a passing reference. Furthermore, the context of the testimony led to the inference that Reyes was simply informing the officers of other people involved in the victim's death. The questions immediately preceding the statement related to Reyes showing the officers where he picked up the victim, where she was abducted from, where to find Valencia, and subsequently where to find defendant. But as we have already mentioned, defendant's physical involvement, i.e., the fact his car was used and he was physically present in the vehicle after the victim was kidnapped and when she was set on fire, were all conceded at trial. Given the ambiguous nature of the testimony, the fact the statement was never elaborated or explained, and the fact it was never again mentioned, we find no reasonable probability defendant would have received a more favorable outcome had his attorney objected and moved to strike the testimony. No one ever remotely argued one could infer from Reyes's statement that defendant intended to kidnap the victim. Nor did the statement itself suggest he somehow played a more active role. Thus, any error could not be considered prejudicial.

<u>Cebrero</u>, 2014 WL 7152594, at *12-14.

a.  <u>Legal Standard</u>

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of counsel are reviewed according to <u>Strickland's</u> two-pronged test.  <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th Cir.1986); <u>see also</u> <u>Penson v. Ohio</u>, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the <u>Strickland</u> standard does not apply and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things.  First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984).  Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  <u>Id</u>. at 694.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial.  <u>Id</u>. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable.  <u>Babbitt v. Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998).

22

1    With the passage of the AEDPA, habeas relief may only be granted if the state-court

2    decision unreasonably applied this general Strickland standard for ineffective assistance.

3    Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a

4    federal court believes the state court's determination under the Strickland standard "was incorrect

5    but whether that determination was unreasonable–a substantially higher threshold." Schriro v.

6    Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard

7    is "doubly deferential" because it requires that it be shown not only that the state court

8    determination was erroneous, but also that it was objectively unreasonable. Yarborough v.

9    Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a

10   state court has even more latitude to reasonably determine that a defendant has not satisfied that

11   standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

12   application was unreasonable requires considering the rule's specificity. The more general the

13   rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

14       In this case, the state court applied the correct federal standard, i.e., Strickland, to

15   Petitioner's contentions regarding counsel's performance. Hence, the only question is whether,

16   having applied the correct test, the state court's application of Strickland was objectively

17   unreasonable. Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

18       b.  Analysis

19       In this case, the appellate court correctly applied the Strickland standard. Therefore, the

20   only determination to be made is whether that application was unreasonable. The Court

21   concludes it was not.

22       The state court noted that the statement at issue could indeed be considered hearsay.

23   However, the state court determined that counsel's failure to object was not unreasonable. First,

24   the statement was very short, ambiguous, and consisted of a single sentence during eight days of

25   testimony. The prosecutor did not ask follow-up questions or utilize the statement in any way.

26   The state court reasonably determined that defense counsel could have made a tactical decision

27   not to call attention to the statement. Moreover, if counsel had objected, this would have

28   prompted the prosecutor to lay additional foundation for the statement. As the statement was

made by the officer to discuss his actions and why he went from one location to another, it was plainly foundational and not offered for its truth. Therefore, the state court determined that any objection would have been overruled. Counsel could not be faulted for failing to make a meritless objection. Petitioner fails to show how the state court's reasoning was erroneous.

Similarly, the state court rejected Petitioner's confrontation clause argument. Since the statement was not testimonial in nature, the confrontation clause was not violated. Crawford v. Washington, 541 U.S. 36, 59, fn. 9 (2004). Petitioner does not show how this determination was unreasonable.

Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or an unreasonable application of Supreme Court authority; therefore, the claim should be denied.

3. Instructions on Post-Crime Conduct

Petitioner claims the trial court erred by instructing the jury with CALCRIM Nos. 362 and 371 concerning Petitioner's post-crime conduct. This claim was also presented on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> The trial court provided the jury with two instructions regarding defendant's postcrime conduct. Namely, the court instructed the jury with an instruction regarding giving false statements pursuant to CALCRIM No. 362 and an instruction regarding fabrication of evidence pursuant to CALCRIM No. 371 at the People's request. Defendant did not object to either instruction nor request any clarifications of the instructions. Defendant now claims the instructions violated his right to due process because the instructions only informed the jury regarding the prosecution's theory of the evidence and failed to inform it of the defense theory of the evidence. We find no error.

> The jury was instructed pursuant to CALCRIM No. 362 as follows:

>> "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt.

>> "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

> In addition, the court instructed the jury consistent with CALCRIM No. 371 as follows:

>> "If the defendant tried to conceal or destroy evidence or obtain false testimony, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide

its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

Relying on *Cool v. United States* (1972) 409 U.S. 100, defendant argues the above instructions were imbalanced because they singled out a certain type of evidence, telling the jury it could use the evidence to infer guilt, but failing to tell the jury it could rely on the evidence to acquit. In *Cool*, the defense relied heavily on the testimony of an accomplice, who admitted his own guilt and insisted the defendant had no culpability. The trial court told the jury the accomplice's testimony should be viewed with suspicion, but it could be considered if the jury was "'convinced it is true beyond a reasonable doubt.'" (*Id*. at p. 102.) The trial court further instructed the jury that the accomplice's testimony, if believed, could "support your verdict of guilty." (*Id*. at p. 103, fn. 4.)

The United States Supreme Court found the accomplice instruction deficient in two respects. First, it "place[d] an improper burden on the defense" to prove the accomplice's testimony was true beyond a reasonable doubt. (*Cool v. United States, supra*, 409 U.S. at p. 103.) Second, it was "fundamentally unfair in that it told the jury that it could convict solely on the basis of accomplice testimony without telling it that it could acquit on this basis." (*Id*. at p. 103, fn. 4.)

Defendant argues the instructions here, like *Cool*, were unfair because they told the jury his postcrime conduct could be used to convict without also telling the jury, in accordance with his theory, that his postcrime conduct could be used to acquit. He claims because he argued there was evidence of his cooperation with the police—in agreeing to be interviewed and subsequently providing information regarding where the officers could find a stash of marijuana—the court should have also instructed the jury this evidence could have been used to support a finding of acquittal. We disagree.

The instructions did not inform the jury all of defendant's postcrime conduct could be considered only to support a finding of guilt. Rather, the above instructions, by their terms, applied only to statements the jury found were false or misleading, or to evidence defendant tried to obtain false testimony or create false evidence. Thus, the instructions simply informed the jury that certain types of conduct may demonstrate an awareness of defendant's guilt and precludes the jury from determining guilt based solely on that evidence. As such, "the instruction is favorable to the defense, because it precludes a jury from convicting a defendant based solely upon his or her dishonest statements relating to the crimes." (*People v. Page* (2008) 44 Cal.4th 1, 51.) The express terms of the instructions require the jury to first determine whether the conduct occurred. If the jury concludes the evidence demonstrates cooperation and truthful statements, the jury has no reason to apply the instructions at all.

Furthermore, unlike the instruction in *Cool*, the instructions here told the jury it could not use evidence of a false statement as the sole evidence to convict. As our Supreme Court has explained, the consciousness of guilt instruction "made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.] We therefore conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its

burden of proof." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.) Additionally, the above instructions expressly informed the jury that the "meaning and importance" of the evidence was for it to decide. Therefore, the instructions did not prevent the jury from considering other conduct as evidence of his innocence.

Moreover, similar instructions have been upheld by our Supreme Court on numerous occasions. (See, e.g., *People v. Kelly* (1992) 1 Cal.4th 495, 531–532 [consciousness of guilt instruction is not improper pinpoint instruction]; *People v. Arias* (1996) 13 Cal.4th 92, 142 [same]; *People v. Crandell* (1988) 46 Cal.3d 833, 870–871, overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 [consciousness of guilt instruction does not violate due process by allowing jurors to draw impermissible inferences]; *People v. Jackson, supra*, 13 Cal.4th at p. 1224 [consciousness of guilt instructions do "not improperly endorse the prosecution's theory or lessen its burden of proof"]; *People v. Famalaro* (2011) 52 Cal.4th 1, 35 [consciousness of guilt instruction did not violate federal constitutional rights to due process, a fair jury trial, nor a reliable jury determination of guilt]; *People v. Jurado* (2006) 38 Cal.4th 72, 125 [consciousness of guilt instructions were not impermissibly argumentative, did not permit jury to draw irrational inferences, and were not potentially misleading].) We find no error in providing the jury with the above instructions.

Cebrero, 2014 WL 7152594, at *17-18.

a. Legal Standard

As previously stated, a claim that a jury instruction violated state law is not cognizable on federal habeas review. Estelle, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp, 414 U.S. at 147. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. Frady, 456 U.S. at 169. In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776). State prisoners seeking federal habeas relief are not entitled to habeas relief unless the error resulted in "actual prejudice." Id.

b. Analysis

Petitioner's claim fails because there is no Supreme Court authority under which the instructions given here could be considered unconstitutional. Petitioner relies on Cool v. United States, 409 U.S. 100 (1979), but as discussed by the appellate court, Cool is distinguishable. In Cool, the jury was instructed to ignore defense testimony unless it believed beyond a reasonable

26

doubt that the testimony was true.  Id.  The Supreme Court held that such an instruction was

unconstitutional.  Rather than "instructing the jury on the care with which it should scrutinize

certain evidence," the judge instructed that "as a predicate to the consideration of certain

evidence, [the jury] must find it true beyond a reasonable doubt."  Id. at 104.  The instructions

further had the effect of reducing the Government's burden of proof.  The jury was precluded

from considering whether the evidence could have created a reasonable doubt; instead, the jury

could only consider the testimony if it was believable beyond a reasonable doubt.  Id.

Here, the jury was not instructed that it could only consider Petitioner's post-crime

conduct as evidence of his guilt.  Rather, the instructions applied only to statements that the jury

found were false or misleading.  No instruction prevented the jury from considering true

statements as evidence of Petitioner's innocence.  There was no artificial barrier created from

consideration of relevant testimony.  Even if the jury found statements to be false or misleading

and therefore evidence of guilt, the jury was admonished to consider such statements with

circumspection, and that it could not find Petitioner guilty solely on the basis of false statements.

Thus, as found by the state court, the instructions were beneficial to the defense.  The state court

reasonably determined that Cool was unsupportive of Petitioner's argument and that there was

nothing unconstitutional about the instructions given.  The claim should be rejected.

### 4.    Ineffective Assistance of Counsel – Failure to Request Limiting Instruction

In his next claim, Petitioner argues that defense counsel was ineffective in failing to

request a limiting instruction, thereby allowing the jury to use Luis Vasquez's guilty plea as

evidence of Petitioner's guilt.  Petitioner presented this claim on direct appeal.  In the last

reasoned decision, the Fifth DCA denied the claim as follows:

> At trial, evidence was admitted establishing Vazquez had pled guilty to simple
> kidnapping and first degree burglary for his participation in the events leading to
> the victim's death. In exchange for his truthful testimony, he would receive no
> more than nine years four months in state prison. He was still awaiting sentencing
> at trial.
>
> Defendant concedes the above evidence was in fact properly admitted as evidence
> bearing on Vazquez's credibility. (U.S. v. Halbert (9th Cir.1981) 640 F.2d 1000,
> 1004; see People v. Williams, supra, 16 Cal.4th at p. 257 [prosecutor's recitation of
> witness's plea agreement was proper to allow jury to assess witness's credibility];
> People v. Fauber (1992) 2 Cal.4th 792, 823 [full disclosure of witness's plea

agreement relevant impeachment evidence that must be disclosed to jury to evaluate witness's credibility].) However, noting the above evidence was not admissible as substantive evidence of defendant's guilt (*Hudson v. North Carolina* (1960) 363 U.S. 697, 702), defendant argues his counsel should have requested a limiting instruction regarding the use of the evidence. His failure to request such an instruction, defendant argues, constituted ineffective assistance of counsel. We disagree.

As we have already noted, to establish ineffective assistance of trial counsel, a defendant must show both that counsel's performance was deficient and that as a result the defendant suffered prejudice. However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. at p. 697.)

To establish prejudice, defendant must show it is reasonably probable he would have received a more favorable result had the jury been instructed it could not use the fact that Vazquez pled to the crimes as substantive evidence of defendant's guilt. Defendant has failed to meet this burden.

Defendant relies upon the decision in *U.S. v. Halbert, supra*, 640 F.2d 1000 to support his argument that failure to give an explicit limiting instruction that a codefendant's plea may not be used as evidence of the defendant's guilt is prejudicial. However, as our Supreme Court has repeatedly noted, "decisions by the federal courts of appeals are not binding on us. (*People v. Seaton* (2001) 26 Cal.4th 598, 653.)" (*People v. Williams, supra*, 56 Cal.4th at p. 668.) Moreover, we need not determine whether *Halbert* was correctly decided because it is distinguishable from the present case.

In *Halbert*, the defendant was charged with conspiracy to commit mail fraud with two others. Both codefendants pled guilty to the charge and both were allowed to testify, over objection, that they had pled guilty to the same conspiracy for which the defendant stood trial. (*U.S. v. Halbert, supra*, 640 F.2d at p. 1003–1004.) The district court instructed the jury that the disposition of the codefendants' cases should not influence it regarding its verdict for the defendant. However, this instruction failed to inform the jury it could only use the codefendants' pleas to evaluate their credibility. Without engaging in a prejudice analysis, the court simply noted that because "of the danger of misuse and the substantial lack of clarity in this instruction, we cannot hold that the faulty instruction was harmless error." (*Id*. at p. 1007.)

The court in *Halbert* failed to explain why the lack of instruction was prejudicial there; rather it simply assumed the "danger of misuse." (*U.S. v. Halbert, supra*, 640 F.2d at p. 1007.) However, we note the crime at issue in *Halbert* was conspiracy. The crime itself, therefore, required an agreement among the parties. In that situation, where the other parties to the agreement have admitted their guilt, there could be a substantial risk that the jury could use the plea as evidence an agreement in fact existed.

Unlike the situation presented in *Halbert*, where the defendant was charged with conspiracy, defendant here was not charged with a crime requiring him to agree with Vazquez. Not only was defendant not charged with conspiring with Vazquez, Vazquez pled to crimes different from the ones for which defendant was tried.

Defendant was tried for aggravated kidnapping and murder. Vazquez, in contrast, pled to simple kidnapping and first degree burglary. Furthermore, it was clear from the trial testimony that Vazquez had little interaction with defendant and testified only to his actual observations of defendant's actions that were corroborated by defendant's own statement. Defendant admitted to being present with the others and leaving with the victim in the trunk of his car. There was no testimony that Vazquez engaged in any agreement with defendant. Nor did Vazquez testify he heard defendant engage in any of the planning in the group. To the contrary, Vazquez made it clear defendant was not present during the initial planning of the kidnapping, and when he arrived later, after the victim was already in the trunk, defendant stood with the group, but he did not hear him speak. Additionally, defendant's own statements put him at the scene of the crime when the others were planning and while they engaged in the fatal act. Although the main focus of the trial was defendant's intent, Vazquez's testimony shed little light on the issue. Vazquez never testified he entered into any agreement with defendant. In fact, he had never met defendant before that day. Moreover, unlike *Halbert*, defendant did not object to Vazquez's testimony regarding his plea.

There was simply no testimony of any agreement between defendant and Vazquez. While Vazquez's testimony did place defendant in a group with Valencia, Ortega, and Reyes, defendant's statement relayed the same information. The question presented to the jury was defendant's intent. However, none of the crimes to which Vazquez pled required the two share the same intent. To the contrary, Vazquez pled to simple kidnapping, which did not require the intent to extort, as did the crime for which defendant was charged. In addition, Vazquez's plea to kidnapping could hardly have come as a surprise to the jury, given Vazquez's admission as to his active role in actually abducting the victim from the Clifford house. It was undisputed, however, that defendant was not present when that action took place. Moreover, Vazquez was clear the initial plan did not encompass plans to kill the victim.

Evidence of defendant's guilt in this case was not dependent upon any implicit or explicit agreement with Vazquez from which the jury could infer his guilt. Rather, evidence of defendant's guilt was derived from his relationship to the other parties and the drugs at issue, the use of his vehicle, his physical presence in the vehicle after the victim was kidnapped, and his presence at the scene where the victim was burned. Vazquez's testimony simply set out direct evidence of defendant's presence when the men discussed what to do with the victim and his observable reactions. Nothing at trial led to the inference that if Vazquez was guilty then defendant must also be guilty.

In short, the fact of Vazquez's plea was not crucial to the prosecution. Indeed, defendant's admissions place him (1) in the vehicle while the victim was in the trunk, (2) in the group when Valencia, Reyes, and Ortega discussed what to do with the victim, and (3) at the scene when the victim was burned. Furthermore, the prosecutor never relied in his closing statements upon the fact of Vazquez's plea to infer guilt. The jurors were instructed with the accomplice instructions, telling them they must view Vazquez's testimony with caution and they could not convict on his testimony unless it was corroborated by other evidence. We presume the jury followed the instruction. (*People v. Smith* (2007) 40 Cal.4th 483, 517.) In light of the evidence, it is not reasonably probable a cautionary instruction would have resulted in a different outcome for defendant. Therefore, any error was not prejudicial and the absence of a cautionary instruction did not constitute ineffective assistance of counsel. (*People v. Holt* (1997) 15 Cal.4th 619, 703–706.)

1    Cebrero, 2014 WL 7152594, at *15-17.

2           a.  Legal Standard

3           As noted above, claims of ineffective assistance of counsel are reviewed according to

4    Strickland's two-pronged test.  Petitioner must establish that counsel's deficient performance fell

5    below an objective standard of reasonableness under prevailing professional norms.  Strickland,

6    466 U.S. at 687-88.  Second, Petitioner must establish that he suffered prejudice in that there was

7    a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on

8    appeal.  Id. at 694.  Further, habeas relief may only be granted if the state-court decision

9    unreasonably applied this general Strickland standard for ineffective assistance.  Knowles, 556

10   U.S. at 122.  Accordingly, the question "is not whether a federal court believes the state court's

11   determination under the Strickland standard "was incorrect but whether that determination was

12   unreasonable–a substantially higher threshold."  Schriro, 550 U.S. at 473; Knowles, 556 U.S. at

13   123.

14          b.  Analysis

15          The state court reasonably determined that Petitioner failed to establish any prejudice

16   resulting from counsel's alleged failure to request a limiting instruction.  As discussed by the state

17   court, evidence that Vasquez pled guilty had little bearing on Petitioner's guilt and was not used

18   by the prosecution as evidence of his guilt.  Vasquez faced different charges, having pled guilty to

19   simple kidnapping, whereas Petitioner was charged and found guilty of first degree murder and

20   kidnapping to commit extortion.  There was no evidence of any agreement between Vasquez and

21   Petitioner.  Vasquez testified that the initial plan did not involve killing the victim. Furthermore,

22   Petitioner's own admissions placed him with his co-defendants when they decided what to do

23   with the victim, in the vehicle when the victim was in the trunk and at the scene where the victim

24   was burned.  Petitioner's guilt was not dependent on Vasquez's guilt.  Rather, his guilt was

25   established by his relationship to other parties involved in the murder and the drugs, his presence

26   at the scene where the victim was burned, the use of his vehicle, and his presence in the vehicle

27   when the victim was kidnapped.  Therefore, even if counsel had requested a limiting instruction,

28   the outcome would have been no different.

30

Moreover, as Respondent correctly points out, there is no Supreme Court authority squarely addressing this issue. Petitioner cites to several Supreme Court cases in support of his arguments, but they are distinguishable and do not squarely address the issue here. Petitioner cites to <u>Lee v. Illinois</u>, 476 U.S. 530 (1986). In <u>Lee</u>, the defendant and a codefendant were tried jointly for committing a double murder. <u>Id</u>. at 531. The codefendant's confession was admitted and relied upon as substantive evidence of both defendants' guilt. <u>Id</u>. at 531. In this case, Vasquez's confession was not relied upon as substantive evidence of Petitioner's guilt, nor did it have any tendency to prove Petitioner's guilt. Therefore, the concerns in <u>Lee</u> are not at issue here.

Petitioner also cites <u>Douglas v. Alabama</u>, 380 U.S. 415 (1965), but <u>Douglas</u> is also unsupportive. In <u>Douglas</u>, a defendant and an accomplice were tried separately on charges of assault with intent to murder. <u>Id</u>. at 416. The accomplice was found guilty first. <u>Id</u>. He was then called at the defendant's trial, but he invoked his privilege against self-incrimination. <u>Id</u>. On cross-examination, the prosecutor read a confession by the accomplice to the jury. <u>Id</u>. The confession was of crucial importance in that it described the event in great detail and named the defendant as the person who fired the shotgun blast that wounded the victim. <u>Id</u>. at 417. The Supreme Court held that this violated the defendant's rights under the Confrontation Clause because he was denied the right to cross-examination. <u>Id</u>. at 419. Again, the instant case is distinguishable. While the confession in <u>Douglas</u> was crucial evidence of the defendant's guilt, Vasquez's confession in this case was of little importance concerning Petitioner. As previously discussed, Petitioner was not implicated in anything he hadn't already admitted, and there was no evidence of an implicit agreement between Vasquez and Petitioner.

Next, Petitioner argues that <u>Bruton v. United States</u>, 391 U.S. 123 (1968) supports his argument, but <u>Bruton</u> too is distinguishable. In <u>Bruton</u>, the defendant Bruton and co-defendant Evans were jointly tried on a federal charge of armed postal robbery. <u>Id</u>. at 124. A postal inspector testified that Evans had confessed to him that he and Bruton had committed the armed robbery. The Supreme Court held that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately

spread before the jury in a joint trial," the defendant's rights under the Confrontation Clause are violated. Id. at 135-36. The concerns in Bruton are not present here. Unlike Bruton, no powerfully incriminating extrajudicial statement was admitted here. Vasquez and Petitioner were not charged with the same crimes, and Vasquez's statement at most corroborated Petitioner's own statements. Bruton does not support Petitioner's claim.

Last, Petitioner cites to Hudson v. North Carolina, 363 U.S. 697 (1960), for the proposition that where one of multiple defendants has pled guilty, that fact may not be used as evidence of guilt of the other defendants. In Hudson, the defendant was tried along with two co-defendants. Id. One of the defendants, David Cain, had counsel, whereas the other two defendants did not. Id. at 698. At the conclusion of the State's evidence, counsel for Cain moved to dismiss the case. Id. When the motion was denied, counsel tendered a plea of guilty to petit larceny on behalf of Cain. Id. at 698-99. The plea was accepted and thereafter the attorney withdrew from the proceedings. Id. at 699. The Supreme Court found that Cain's plea of guilt on the advice of counsel midway through the proceedings in the presence of the jury was obviously potentially prejudicial. Id. at 703-04. Cain's plea was unduly prejudicial because the co-defendants were without the assistance of counsel; they were laymen who would hardly have been aware that they could invoke protections against the prejudicial effect of the Cain's plea. Id. at 703. Thus, the Supreme Court determined that the co-defendants had been denied the right to counsel. Id. at 704.

Hudson offers no support for Petitioner's claim. Petitioner was represented by counsel, and Vasquez's statement in Petitioner's trial was nothing like the prejudicial position the defendants found themselves in Hudson.

Last, Petitioner claims that the trial court should have *sua sponte* given limiting instructions to ensure that Vasquez's statements could not be used as evidence of Petitioner's guilt. As noted by Respondent, Petitioner cites only circuit cases. There are no Supreme Court cases which would have required the trial court to give such instructions. Therefore, the claim fails.

5.     Insufficient Evidence of Special Circumstance Finding

Petitioner next claims that there was insufficient evidence to support the felony-murder special circumstance. This claim was raised on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Defendant contends the evidence was insufficient to support the felony-murder special-circumstance finding. Specifically, he argues the evidence failed to establish he was a major participant in the crimes and acted with a reckless indifference for human life. We disagree.
>
> When a defendant challenges the sufficiency of the "evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) Further, we review
>
>> "the evidence in the light most favorable to the prosecution, [asking whether] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.)
>
> "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)
>
> "Whether the evidence presented at trial is direct or circumstantial, ... the relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations]" (*People v. Towler* (1982) 31 Cal.3d 105, 118–119.)
>
>> "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]' [Citation.] "'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'" [Citations.]" (*People v. Stanley, supra*, 10 Cal.4th at pp. 792–793.)
>
> "In order to support a finding of special circumstances murder, based on murder

committed in the course of [a felony], against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds.(c), (d).)" (*People v. Proby* (1998) 60 Cal.App.4th 922, 927.) At trial, the prosecution conceded defendant was not the actual killer and proceeded on a theory of aiding and abetting first degree felony murder. Thus, the jury was required to find defendant either harbored the intent to kill or he was a major participant in the crime and acted with a reckless indifference to human life.

The level of participation required to be a "major participant" was discussed by the Third Appellate District in *People v. Proby, supra*, 60 Cal.App.4th 922. The court explained the common meaning of the term "major" includes "'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.'" (*Id*. at p. 931.) Furthermore, the court explained the "term 'reckless indifference to human life' means 'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.'" (*Id*. at p. 928.)

In *People v. Hodgson* (2003) 111 Cal.App.4th 566, the court found a defendant's action of holding open a garage door, which facilitated his cohort's escape after the cohort robbed, shot and killed a woman in a parking garage, constituted major participation in the crime. In reaching that conclusion, the court relied in part upon the fact there were only two individuals involved in the crime. The crime was not "committed by a large gang or a group of several accomplices. Instead only two individuals were involved. Thus, [the defendant]'s role was more 'notable and conspicuous'—and also more essential—than if the shooter had been assisted by a coterie of confederates." (*Id*. at pp. 579–580.) Although there were several people involved in the plot to kidnap and in the actual kidnapping of the victim, it is significant that defendant was one of only three who were present at the scene where the fatal wound was inflicted. The other two individuals present, Valencia and Ortega, each played a part in inflicting the injury. Although defendant did not inflict the actual injury, his actions in allowing his vehicle to be used to transport the victim to the field where she was set on fire, his presence at the scene, his admission to Esparza that he assisted in removing the victim from the trunk, and the fact he left the scene with the others, again, in his vehicle, after the victim was set ablaze, lead to the conclusion defendant's participation was "notable and conspicuous."

The case is similar to *People v. Smith* (2005) 135 Cal.App.4th 914, overruled on other grounds in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291. In *Smith*, three men were involved in the attempted robbery and murder of the victim. The evidence established the men went to the victim's apartment to rob her. Smith entered the room while Taffolla remained outside as a lookout. The evidence was unclear as to whether the third man, Felix, also entered the room with Smith or only served as a getaway driver. The victim was badly beaten, stabbed 27 times, and had her head smashed through a wall. Taffolla was convicted of first degree murder as well as the felony-murder special circumstance. He argued the evidence was insufficient to support the special circumstance finding. (*Id*. at pp. 919–920.) In rejecting the argument, the *Smith* court noted that even if Taffolla remained outside during the attack as a lookout, "[t]he jury could have found beyond a reasonable doubt that Taffolla's contributions were 'notable and conspicuous' because he was one of only three perpetrators, and served as the only lookout to an attempted robbery occurring in an occupied motel complex." (*Id*. at p. 928.) Likewise here, defendant's assistance in allowing the others to use his car to

transport the victim to the scene, his presence during the planning stages of what to do with the kidnapped victim, his assistance in removing the victim from the trunk, and his presence at the scene of the murder watching the two actual perpetrators commit the fatal act qualifies as major participation.

Viewing the facts in the light most favorable to the judgment, as we must, it was reasonable for the jury to infer defendant was a major participant in the charged crimes. It was defendant who initially transported the victim and the marijuana, and it was defendant who was owed at least a portion of the proceeds. The prosecution's theory was that the missing marijuana either belonged to defendant or he was responsible for the drugs to the owner. The evidence supported this theory as defendant admitted he transported the victim and the drugs to a house, the victim owed him money for the proceeds, and he told Esparza he was proving he was not involved in the disappearance of the drugs. Indeed, after defendant dropped the victim at the house where she was apparently going to sell the drugs, he asked her where the money was and she told him she would pay him later. Once realizing the victim had not provided the money, Reyes was contacted and indicated he knew of someone who could do them a favor. The jury could infer that due to defendant's connection to the drugs, either he contacted Reyes, whom he admitted knowing, or he informed Ortega about the missing drugs and money that, in turn, set the whole ordeal in motion.

Furthermore, it is significant defendant's vehicle was used to abduct the victim, although, admittedly, defendant was not present for the actual kidnapping. While defendant denied knowing what his car would be used for when he spoke to the police, defendant admitted to Esparza that he loaned the others his car to prove he was not responsible for the missing drugs. From this evidence, the jury was entitled to infer defendant loaned his car to the others knowing the victim would be kidnapped.

Moreover, the evidence established defendant continued to allow his car to be used throughout the course of the kidnapping once he joined the others. He was also present at each subsequent significant step: the transporting of the victim to a field for interrogation, the planning stages regarding what to do with her after her interrogation where it became clear she would be killed, the transporting of her to the field where she was burned, and during the fatal act itself. Notably, according to Vazquez, defendant, Ortega, and Vazquez continued their discussion after the others had left the group when Valencia was holding the gasoline-filled bottle. Although defendant did not take part in the actual fatal act, his presence during each of these critical phases, where he never expressed an objection to the plan, never left the others or discontinued his permission to use his car, and where he left the scene with the perpetrators after the victim was burned rather than stay and render her aid, all demonstrate his participation was "'notable or conspicuous in effect or scope.'" (*People v. Proby, supra*, 60 Cal.App.4th at pp. 933–934.)

Defendant compares this case to *Tison v. Arizona* (1987) 481 U.S. 137, arguing the perpetrator's actions there were more involved and further arguing his actions were therefore insufficient. In *Tison*, the Supreme Court addressed whether a defendant who participated in events that led to several murders but who neither harbored the intent to kill nor inflicted the fatal wounds could constitutionally be subjected to the death penalty. (*Id.* at p. 138.) The court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy" the culpability requirement necessary to impose the death penalty. (*Id.* at p. 158.)

In reaching this conclusion, the court analyzed the defendants' actions and explained their behavior exhibited a high level of participation, thus satisfying the first prong of the death penalty eligibility. The defendants along with several relatives had engaged in a plan to help their father, who was serving a life sentence for killing a guard in the course of an escape, escape from prison. The plan included assisting their father's cellmate, also a convicted murderer, escape as well. The defendants assembled a mass of weapons that they smuggled into the prison and used to effect the escape. While on the run, their car became disabled with a flat tire and one of the defendants stood by the car to flag down a passing motorist while the other armed men lay in wait. The victims stopped to assist and were confronted by the armed men. The victims were forced into the vehicle and the defendants along with the armed men drove them into the desert. At one point, the defendants' father had the victims exit the vehicle and assemble in front of the headlights. The victims pleaded for their lives, asking to just be left in the desert with some water. As the defendants retrieved a jug of water, their father and his cellmate brutally murdered the victims. Both of the defendants stated they were surprised when they heard the shots, but they both left with the others, leaving the victims in the desert. (*Tison v. Arizona, supra,* 481 U.S. at pp. 139–141.)

Comparing the facts of this case to *Tison,* as well as several cases from other jurisdictions, defendant argues the facts here are insufficient to support a finding he was a major participant in the crime. The analogy is inapt, however, as nothing in *Tison* or the other cases cited by defendant indicate the defendants' actions there constituted a minimum threshold for major participation. While *Tison* did discuss a hypothetical nonmajor participant, who sat in a car away from the actual scene of the murder, acting as the getaway driver to a robbery, defendant's actions far exceeded those of the hypothetical defendant. Defendant, who had a monetary stake in the missing drugs, was present at each planning stage, allowed his car to be used throughout the ordeal, assisted in the victim's removal from the car, and stood by and watched as two of his cohorts set the victim on fire, as if standing by to make sure the plan was carried through, then left with the perpetrators rather than stay and help the victim. Under these circumstances, defendant's participation could not be considered anything other than major.

Likewise, the evidence was sufficient to demonstrate defendant's reckless indifference to human life. The "culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death'...." (*People v. Estrada* (1995) 11 Cal.4th 568, 577, quoting *Tison v. Arizona, supra,* 481 U.S. at p. 157.) There can be no doubt defendant acted with such indifference here. By his own admission, he suspected the discussion between Reyes and Ortega regarding the victim could mean they would kill her. Defendant was aware the victim had been kidnapped and was in the trunk of his car. He saw she had been bound and had her face covered. He was present when she was interrogated regarding the location of the marijuana. As defendant had initially transported the victim with the marijuana, and admitted the victim had not paid him from the proceeds of the sale of the drugs, he knew the money was not accounted for. He observed her in the trunk of his car while she was questioned about the marijuana and remained present as the men discussed what to do with her. He was likewise present when Valencia stated he "kn[e]w what to do" and obtained a bottle filled with gasoline. Knowing the victim had been kidnapped, that she had failed to pay for the drugs, and that Valencia had obtained a bottle filled with gasoline immediately after discussing what to do with the victim, one could infer defendant in fact knew the victim would be killed or, at the very least, badly burned. By accompanying the others, while the victim was in the trunk of his car, to the field where he assisted in her removal from the vehicle

and where the victim was set on fire, and further leaving with the others as the victim burned without attempting to render her aid or seek help, defendant acted with reckless indifference to life. Therefore, the evidence was sufficient to support the special circumstance finding.

Cebrero, 2014 WL 7152594, at *19-22.

a. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no

rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

b.  Analysis

As stated by the state appellate court, in order to prove an aider and abettor guilty of the felony murder special circumstance, "the prosecution must show that the aider and abettor had intent to kill *or acted with reckless indifference to human life while acting as a major participant in the underlying felony*."  Cal. Penal Code § 190.2(c), (d) (emphasis added).  To be a major participant, the aider and abettor must be a noticeable or conspicuous member, one of the larger or more important members of a kind or group.  People v. Proby, 60 Cal.App.4th 922, 931 (1998).  To harbor "reckless indifference to human life," the prosecution must show that the defendant has a "subjective awareness of the grave risk to human life created by his or her participation in the underlying felony."  Id. at 928.

In this case, the state court reasonably determined that Petitioner was a major participant. Petitioner was only one of three people who were present at the scene where the victim was burned.  Petitioner did not set the victim on fire, but he was an integral participant.  Petitioner initially transported the victim and the marijuana, and the victim owed him a portion of the proceeds.  His vehicle was used to transport the victim to the field where she was set on fire; he assisted in removing the victim from the vehicle's trunk; and he left with the other perpetrators.  Thus, the state court reasonably found that Petitioner's participation was "notable and conspicuous."

The state court also reasonably determined that Petitioner acted with reckless indifference to human life.  Petitioner admitted that he suspected the discussion between Reyes and Ortega regarding the victim could mean they would kill her.  He knew the victim was kidnapped and was in the trunk of his vehicle.  He saw that she had been bound and her head covered.  He was there

38

when they discussed what to do with the victim, and when Valencia stated he "kn[e]w what to do" and obtained a bottle full of gasoline. The jury could easily infer that Petitioner knew the victim would be killed or burned, yet he accompanied the others to the field. He assisted in removing the victim from the vehicle and was present where the victim was set on fire. He then left with the others. He never sought to stop the killing, nor did he offer her aid or seek help. From these facts, it was not unreasonable for the state court to conclude that there was sufficient evidence that Petitioner acted with reckless indifference to life. The claim should be rejected.

6.    Instructional Error – Kidnapping Special Circumstance

Petitioner next argues that the trial court violated his due process rights by giving the jury conflicting instructions on the mental state element of the kidnapping special circumstance. This claim was raised and denied on direct review. In the last reasoned decision the Fifth DCA analyzed the claim as follows:

> Defendant argues the instructions as provided to the jury were conflicting regarding the mental state required to support the special circumstance. As defendant correctly notes, a person who aids and abets in a felony resulting in the victim's death, but who is not the actual killer, may be convicted of a felony-murder special circumstance only if it is also proven the person was a major participant in the crime and acted with reckless indifference to human life. (§ 190.2, subd. (d); *People v. Mil* (2012) 53 Cal.4th 400, 408–409; *People v. Estrada*, *supra*, 11 Cal.4th at p. 575; see *Tison v. Arizona, supra*, 481 U.S. at p. 158.) Defendant contends the instructions as given in this case allowed the jury to convict him of the special circumstance without finding either he intended to kill the victim or acted as a major participant with reckless indifference to life. We disagree.

> "'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] "[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial." [Citation.] "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." [Citation.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)

> "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) "In reviewing the purportedly erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.] In conducting this inquiry, we are mindful that "'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."' [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 957,

disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

We consider the instructions as a whole, the jury's findings, and the closing arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 35–36, disapproved on other grounds in *People v. Moon* (2005) 37 Cal.4th 1, 17; *People v. Eid* (2010) 187 Cal.App.4th 859, 883.) We will find error only if it is reasonably likely the instructions as a whole caused the jury to misunderstand the applicable law. (*Estelle v. McGuire* (1991) 502 U.S. 62, 74; *People v. Kelly* (1992) 1 Cal.4th 495, 525–527.)

The trial court initially instructed the jury with CALCRIM No. 540B regarding the elements of felony murder where the defendant aided and abetted a felony and a coparticipant committed the fatal act. In addition to listing the elements of the offense, the instructions specifically informed the jury to refer to other instructions in determining whether defendant aided and abetted a felony.

The jury was instructed with CALCRIM No. 730 as follows:

> "The defendant is charged with the special circumstance of murder committed while engaged in the commission of Kidnapping.

> "To prove that this special circumstance is true, the People must prove that:

> "1. The defendant committed or aided and abetted another person to commit Kidnapping;

> "2. The defendant intended to commit Kidnapping or intended to aid and abet the perpetrator to commit Kidnapping;

> "3. If the defendant did not personally commit Kidnapping, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed Kidnapping;

> "4. The defendant did an act that caused the death of another person;

> "5. The act causing the death and the kidnapping were part of one continuous transaction;

> "AND

> "6. There was a logical connection between the act causing the death and the kidnapping. The connection between the fatal act and the kidnapping must involve more than just their occurrence at the same time and place.

> "To decide whether the defendant committed Kidnapping, please refer to the separate instructions that I have given you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder.

> "To decide whether the defendant aided and abetted a crime, please refer to the separate instructions I have given you on aiding and abetting.

> "In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit Kidnapping independent

40

of the killing. If you find that the defendant only intended to commit murder and the commission of Kidnapping was merely a part of or incidental to the commission of that murder, then the special circumstance has not been proved.

"The defendant must have intended to commit or aided and abetted the felony of kidnapping before or at the time of the act causing the death."

In addition, the court instructed the jury pursuant to CALCRIM No. 703 as follows:

"If you decide that the defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance of Murder in the commission of kidnapping, *you must also decide* whether the defendant acted either with intent to kill or with reckless indifference to human life.

"In order to prove the special circumstances for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor, the People must prove either that the defendant intended to kill, or the People must prove all of the following:

"1. The defendant's participation in the crime began before or during the killing;

"2. The defendant was a major participant in the crime;

"AND

"3. When the defendant participated in the crime, he acted with reckless indifference to human life." (Italics added)

Defendant contends these instructions, given in combination, provided the jury with conflicting information. Namely, he argues, CALCRIM No. 730 allowed the jury to convict without a finding of intent to kill or acting as a major participant acting with a reckless indifference for life, while CALCRIM No. 703 required such a finding. Thus, he argued, it was possible for the jury to convict defendant of the special circumstance under the theory he was not the actual killer without making the requisite findings regarding his intent. We disagree with defendant's analysis.

Defendant reads the instructions as conflicting with each other; however considering the instructions as a whole, as we must, we conclude the instructions actually supplement each other. The jury was instructed with CALCRIM No. 540B regarding felony murder under an aiding and abetting theory where a coparticipant committed the actual killing, and CALCRIM No. 730 regarding the elements of the felony-murder special circumstance. Both instructions referred the jurors to other instructions on aiding and abetting. In CALCRIM No. 703 the jurors were further instructed of *additional elements* necessary to find the special circumstance true if they determined defendant was not the actual killer but rather was guilty of first degree murder on an aiding and abetting theory. Indeed, the plain language of CALCRIM No. 703 itself demonstrates the jury is to make additional, not separate, findings. The instruction begins by stating that:

"*If you decide* that the defendant is guilty of first degree murder *but was*

41

*not the actual killer*, then, *when you consider the special circumstance* of Murder in the commission of kidnapping, *you must also decide* whether the defendant acted either with intent to kill or with reckless indifference to human life.

"In order to prove the special circumstances for a defendant who is not the actual killer but who is guilty of first degree murder *as an aider and abettor*, the People must prove...." (Italics added.)

The introductory paragraph explained the instruction was to be considered in conjunction with other instructions on the special circumstance. It was applicable if the jury determined defendant was not the actual killer and instead acted as an aider and abettor. Upon making that finding, the instruction *required* an additional finding regarding defendant's intent. The instruction itself in no way conflicts with CALCRIM No. 730. Reading the two instructions together, we find it was not reasonably likely the instructions as a whole would have misled the jury and allowed it to find defendant guilty of the special circumstance without also finding he was a major participant in the crime and acted with a reckless disregard for life.

Moreover, the prosecutor further clarified the jury must consider defendant's intent to find the special circumstance true if it determined defendant was not the actual killer. In explaining the special circumstance, the prosecutor first discussed the elements of the special circumstance listed in CALCRIM No. 730. He focused specifically on the definition of one continuous transaction and evidence that established the elements had been met. After discussing those elements, the prosecutor stated as follows:

"There's one last requirement to find the special circumstance true, and these are also regarding—if the defendant was not the actual killer, you must find, one, the defendant's participation in the kidnap began before the killing. Yes. His participation in the kidnapping started when he made the call to Urbano Ortega and said, 'My weed got ripped off.' And his participation in this kidnapping went all the way through to the very end when he was present when she was burned. The defendant was a major participant—I just spoke about that—from start to finish. But for the defendant trying to use [the victim] to sell his marijuana and her ripping him off, none of this wouldn't [*sic*] happen. He is what put all of this in motion, and he was a major participant, therefore.

"When the defendant participated in the kidnap, he acted with reckless indifference to human life. And reckless indifference to human life means criminal activity that means a grave risk of death. [¶] That's for you to decide...."

Thus, the prosecutor specifically explained the additional intent requirement of the special circumstance if the jury found defendant was not the actual killer. Contrary to defendant's assertion otherwise, the prosecutor never argued the jury could find the special circumstance true merely because defendant "intended to aid in the kidnap." Rather, this reference was made as the prosecutor discussed the elements of the special circumstance. Nothing in the argument can be construed as an assertion that defendant's intent to aid in the kidnap was sufficient by itself to support the allegation.

We presume the """jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."""" (*People v. Martin* (2000) 78

42

Cal.App.4th 1107, 1111.) Reviewing the instructions as a whole as well as the arguments of counsel, we conclude there is no reasonable likelihood the jury interpreted the instructions as allowing it to find the special circumstance true without also finding the necessary intent. Therefore, we find no error.

Cebrero, 2014 WL 7152594, at *22-26 (footnotes omitted).

a. Legal Standard

As previously stated, a claim that a jury instruction violated state law is not cognizable on federal habeas review. Estelle, 502 U.S. at 71-72. To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72; Cupp, 414 U.S. at 147. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. Frady, 456 U.S. at 169. In addition, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776). State prisoners seeking federal habeas relief are not entitled to habeas relief unless the error resulted in "actual prejudice." Id.

b. Analysis

In this case, the state court analyzed the claim citing relevant Supreme Court authority in Tison v. Arizona and Estelle v. McGuire. Therefore, the question is whether that application was unreasonable. The Court finds that it was not.

In accord with Estelle, 502 U.S. at 72, the state court considered the instructions as a whole, rather than in isolation. After reviewing all of the instructions, the state court reasonably concluded that there was no likelihood that the jury misunderstood the instructions. The jury was clearly instructed that if it found Petitioner guilty of first degree murder but not as the actual killer, it must also decide whether he acted with the intent to kill or with reckless indifference to human life. In addition, the jury would have been required to find Petitioner was a major participant. A jury following its instructions would have been compelled to make these additional findings.

This was further clarified by the prosecutor in his closing remarks. The prosecutor argued

43

that the jury was required to consider Petitioner's intent in order to find him guilty of murder if he

was not the actual killer. The prosecutor further argued that Petitioner was a major participant,

but these were determinations to be made by the jury.

Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or

an unreasonable application of Supreme Court authority. He further fails to show that the state

court's decision was based on an unreasonable determination of the facts. The claim should be

rejected.

7.      Instructional Error – Proof of Motive

Petitioner also claims that the trial court fundamentally undercut the prosecutor's burden

of proof by instructing the jury that the state did not need to prove motive in the crime of

kidnapping for extortion. Petitioner also presented this on direct appeal where it was denied in a

reasoned decision. In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> Defendant contends the trial court lowered the prosecution's burden of proof by
> instructing the jury the prosecutor need not prove motive in the crime of
> kidnapping for the purpose of extortion. He claims that as applied to this case, the
> motive for the kidnapping was the same as the intent. Therefore, the instruction
> informing the jury that the prosecution need not prove defendant's motive for
> committing the offense removed an element from the jury's consideration. We
> disagree.
>
> As defendant recognizes, our Supreme Court has explained motive and intent are
> not one and the same. In *People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504, the
> court explained "although malice and certain intents and purposes are elements of
> the crimes, as the court correctly instructed the jury, *motive* is not an element.
> 'Motive, intent and malice—contrary to appellant's assumption—are separate and
> disparate mental states. The words are not synonyms. Their separate definitions
> were accurate and appropriate.' [Citation.] Motive describes the reason a person
> chooses to commit a crime. The reason, however, is different from a required
> mental state such as intent or malice."
>
> *Hillhouse* specifically addressed the propriety of giving a motive instruction where
> the defendant was charged under section 209 with kidnapping to commit robbery.
> The court found that motive was not an element of kidnapping to commit robbery.
> This is because committing kidnapping for the purpose of robbery is the same as
> committing kidnapping with the intent to steal. While "malice and intent or
> purpose to steal were elements of the offenses, motive was not." (*People v.
> Hillhouse, supra*, 27 Cal.4th at p. 504.)
>
> Likewise here, kidnapping to commit extortion is the same as kidnapping with the
> intent to take something of value from the victim. (*People v. Greenberger* (1997)
> 58 Cal.App.4th 298, 374 [intent to extort is necessary element of aggravated
> kidnapping]; *People v. Martinez* (1984) 150 Cal.App.3d 579, 588, disapproved on
> other grounds by *People v. Hayes* (1990) 52 Cal.3d 577, 628, fn. 10 [intent to

extort something of value with respect to aggravated kidnapping].) While the intent to take something of value was an element of the crime of kidnapping for extortion, defendant's motive in doing so was not.

In *People v. Fuentes* (2009) 171 Cal.App.4th 1133, we rejected a similar argument. There, the defendant was charged with active gang participation as well as a gang enhancement and special circumstance. Regarding the substantive offense, the jury was instructed it must find, among other elements, that the defendant "'willfully assisted[,] further[ed or] promoted felonious criminal conduct by members of the gang.'" (*Id*. at p. 1139.) The defendant argued this instruction conflicted with the standard motive instruction that was also read to the jury. We rejected the argument, explaining the instructions informed the jury that the prosecution was required to prove the defendant "intended to further gang activity but need not show what motivated his wish to do so." (*Id*. at pp. 1139–1140.)

We further explained that if the defendant's

> "argument has a superficial attractiveness, it is because of the commonsense concept of a motive. Any reason for doing something can rightly be called a motive in common language, including—but not limited to—reasons that stand behind other reasons. For example, we could say that when A shot B, A was motivated by a wish to kill B, which in turn was motivated by a desire to receive an inheritance, which in turn was motivated by a plan to pay off a debt, which in turn was motivated by a plan to avoid the wrath of a creditor. That is why there is some plausibility in saying the intent to further gang activity is a motive for committing a murder: A wish to kill the victim was a reason for the shooting, and a wish to further gang activity stood behind that reason. The jury instructions given here, however, were well adapted to cope with the situation. By listing the various 'intents' the prosecution was required to prove (the intent to kill, the intent to further gang activity), while also saying the prosecution did not have to prove a motive, the instructions told the jury where to cut off the chain of reasons. This was done without saying anything that would confuse a reasonable juror." (*People v. Fuentes, supra*, 171 Cal.App.4th at p. 1140.)

Likewise here, the instructions did not confuse the jury. The jury was told that in order to find defendant guilty of aggravated kidnapping, it must find he acted with a certain intent, namely to "get money or something valuable." However, the jury was not required to find what motivated defendant to commit the kidnapping for extortion (namely, it need not determine why it was that defendant intended to extort or get something of value from the victim). This distinction did not provide a fine line between motive and intent, but rather explained to the jury where "to cut off the chain of reasons." (*People v. Fuentes, supra*, 171 Cal.App.4th at p. 1140.)

Defendant cites several cases involving financial-gain special circumstances, noting the Supreme Court has recognized "that where an intent element requires the jury to find the reason a defendant performs an act, intent and motive are one and the same." However, nothing in the cases cited undercuts the reasoning set forth by the Supreme Court in *People v. Hillhouse*. Rather, the cited cases either discussed the sufficiency of the evidence of the financial-gain special circumstance without any discussion regarding the interplay between motive and intent, or the cases summarily rejected the argument due to the inapplicability of a motive

instruction to a special circumstance. *People v. Hillhouse*, however, directly discussed whether providing the jury with a motive instruction in an aggravated kidnapping case lessened the prosecution's burden of proof regarding the substantive crime. As our Supreme Court has rejected this argument, defendant's claim must fail.

Cebrero, 2014 WL 7152594, at *26–27 (footnotes omitted).

a. Legal Standard and Analysis

The same legal standard for claims of instructional error set forth in previous claims applies here. Petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72.

Petitioner merely disagrees with the Fifth DCA's interpretation of state law. In rejecting his claim, the Fifth DCA relied on the California Supreme Court's decision in People v. Hillhouse, 27 Cal.4th 469, 503-04 (2002), in finding that motive was not an element of kidnapping to commit extortion. This Court is bound by the state court's interpretation of state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005). As Respondent correctly notes, "[a]ny error in the state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief." Menendez v. Terhune, 422 F.3d 1012, 1019 (9th Cir. 2005). Petitioner's claim should be rejected.

8. False Evidence

Petitioner alleges that the prosecution used false evidence in violation of his constitutional rights. In support of his claim, he submits a post-trial declaration from Vasquez. At trial, Vasquez testified that Petitioner was not threatened to participate. Vasquez now comes forward with a statement that he had testified incorrectly and that he had threatened Petitioner with a gun.

a. State Court Rulings

Petitioner raised this claim on habeas to the state courts. He first raised it to the superior court which denied the petition. The superior court found that the issues were essentially the same issues already raised and rejected on direct appeal, and rejected the claims citing In re Dixon, 41 Cal.2d 756, 759 (1953); In re Harris, 5 Cal.4th 813, 829-42 (1993); and In re Waltreus, 62 Cal.2d 218, 225 (1965). (LD 19.) The court found that the issues could have been raised on direct appeal, but were not, and therefore could not be raised on habeas corpus. As to the instant

46

claim, it appears the state court ruling was erroneous. The claim is based on a post-trial declaration from Vasquez; therefore, it could not have been raised on direct appeal. Thus, the bars of <u>Dixon</u> and <u>Waltreus</u> were wrongly invoked.

In his subsequent habeas petition to the California Court of Appeal, Petitioner raised the same claims. Petitioner argued that the superior court erred in its ruling because it failed to account for the new evidence of Vasquez's declaration. (LD 20.) The Fifth DCA denied the petition without comment. (LD 21.)

Petitioner then filed a habeas petition in the California Supreme Court. (LD 22.) Petitioner explained that his claims were based on new evidence. He again brought the superior court's error to the state court's attention. The California Supreme Court denied the petition without comment or citation to authority. (LD 23.) Under the "look through" doctrine, where there has been one reasoned state judgment rejecting a federal claim, there is a rebuttable presumption that later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). Where the last reasoned decision explicitly imposes a procedural default, it is presumed "that a later decision rejecting the claim did not silently disregard that bar and consider the merits." <u>Id</u>. Strong evidence can rebut that presumption. <u>Id</u>. at 804.

The superior court provided the last reasoned decision, and as discussed above, that decision was erroneous. Since the appellate court and California Supreme Court silently rejected the petition, it is presumed they did so on the same erroneous ground. Respondent contends the presumption is rebutted because Petitioner advised the higher courts of the superior court's error. Respondent's argument is persuasive. The petitions filed in the California Court of Appeal and California Supreme Court are replete with arguments and statements by Petitioner that his claims are based on new evidence, and that this fact was ignored by the superior court in its analysis. In his habeas petition to the appellate court, Petitioner notes that his claim is based on "new evidence." (LD 20 at 5.) He then notes that a federal petition in the federal court was stayed at that time in order to allow him to exhaust his claim based on new evidence, and he attached the relevant ruling of the District Court in support. (LD 20 at 6; Ex. A, Attach. 1.) His first exhibit is

47

1   in fact the new evidence, Vasquez's declaration. (LD 20, Ex. A.) Finally, in his memorandum of

2   points and authorities, he argues that the state court failed to account for this new evidence. (LD

3   20, Memorandum at 4.) His petition to the California Supreme Court made the same arguments

4   and statements concerning the superior court's error. (LD 22.)

5       Respondent correctly notes that "judges are presumed to know the law and to apply it in

6   making their decisions." Walton v. Arizona, 497 U.S. 639, 653 (1990), *overruled on other*

7   *grounds by* Ring v. Arizona, 536 U.S. 584 (2002). In this case, there is no reason to find that the

8   state courts ignored all of Petitioner's statements and arguments concerning the new evidence,

9   and then erred by misapplying state procedural law. Coupled with the presumption that judges

10  know the law and correctly apply it, Petitioner's numerous statements and arguments concerning

11  the superior court's error constitute strong evidence to rebut the presumption that the appellate

12  court and California Supreme Court simply adopted the erroneous decision below. Accordingly,

13  the Court finds that the California Supreme Court's silent denial constitutes a decision on the

14  merits entitled to AEDPA deference.

15      b.  Legal Standard

16      "[A] conviction obtained by the knowing use of perjured testimony is fundamentally

17  unfair, and must be set aside if there is any reasonable likelihood that the false testimony could

18  have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); Napue

19  v. Illinois, 360 U.S. 264 (1959). So must a conviction obtained by the presentation of false

20  evidence. See United States v. Bagley, 473 U.S. 667, 678-80 nn.8-9 (1985). In Napue, the

21  Supreme Court held that the knowing use of false testimony to obtain a conviction violates due

22  process regardless of whether the prosecutor solicited the false testimony or merely allowed it to

23  go uncorrected when it appeared. Id. at 269. The Court explained that the principle that a State

24  may not knowingly use false testimony to obtain a conviction - even false testimony that goes

25  only to the credibility of the witness - is "implicit in any concept of ordered liberty." Id. In order

26  to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or

27  evidence) was actually false, (2) the prosecution knew or should have known that the testimony

28  was actually false, and (3) the false testimony was material." United States v. Zuno–Arce, 339

48

F.3d 886, 889 (9th Cir. 2003), *cert. denied*, 540 U.S. 1208 (2004).  Nevertheless, simple

inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

the admission of false testimony.  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).

"Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."

Id.

      c.  Analysis

     The claim fails because there is no allegation that the prosecutor knew or should have

known that Vasquez's trial testimony was false.  Thus, even if Vasquez lied, there is no basis for

granting habeas relief.

     Petitioner cites to several cases in support of his claim that his due process rights under

the Fourteenth Amendment were violated.  In Maxwell v. Roe, 628 F.3d 486, 506 (9th Cir. 2010),

the Ninth Circuit found that a key witness's perjured testimony violated the defendant's right to

due process.  In Maxwell, however, AEDPA deference was not applied because the Court

determined that the state court decision was based on an unreasonable determination of the facts.

Id.  In addition, the false testimony in Maxwell was the "make-or-break witness for the State."

Id. at 508.  Nearly all of the other evidence was circumstantial.  Id.  In this case, the new evidence

is entirely suspect.  Vasquez was a participant in the crimes.  In exchange for his truthful

testimony, he received a sentence of nine years and four months.  Now, some eight years after his

testimony, he has changed his recollection of a "critical fact" to the "truth as [he] remember[s] it

now."  (Pet., Vasquez Decl.).  "Recantation testimony is properly viewed with great suspicion."

Dobbert v. Wainwright, 468 U.S. 1231, 1233 (1984).  As noted by the Ninth Circuit, "[r]ecanting

testimony is easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear,

witnesses with personal motives change their stories many times, before and after trial."  Carriger

v. Stewart, 132 F.3d 463, 483 (9th Cir. 1997).  "[I]t is very often unreliable and given for suspect

motives."  Dobbert, 468 U.S. at 1233-34.  Vasquez's recantation testimony is highly suspect

given the timing, his obvious motive to help a co-defendant, and his possible misrecollection

based on the amount of time that passed from when he testified.  Moreover, Vasquez's testimony

was not the only evidence.  Petitioner himself admitted to his participation and his attendance at

key points in the crime.  Therefore, Petitioner fails to demonstrate a violation of his constitutional rights.

Petitioner also appears to bring a free-standing claim of actual innocence based on the Vasquez declaration.  The Supreme Court has stated that whether a federal constitutional right to be released upon proof of actual innocence remains an open question.  <u>Dist. Attorney's Office for Third Judicial Dist. v. Osborne</u>, 557 U.S. 52, 71 (2009).  Therefore, the state court's decision rejecting the claim cannot be found to be contrary to or an unreasonable application of state law.

Even if such a constitutional right existed, Petitioner has not shown actual innocence such that "no reasonable juror viewing the record as a whole would lack reasonable doubt."  <u>House v. Bell</u>, 547 U.S. 518, 554 (2006).  As previously discussed, Vasquez's declaration is highly suspect.  Further, the testimony of a co-defendant "do[es] not constitute the type of trustworthy, reliable evidence that <u>Schlup [v. Delo</u>, 513 U.S. 298 (1995)] envisioned.  <u>Melson v. Allen</u>, 548 F.3d 993, 1002-03 (11th Cir. 2008).  In addition, other evidence including Petitioner's own admissions placed him at the scene of the crime at all relevant time periods.  Thus, even if a constitutional right to release based on actual innocence existed, Petitioner has failed to make a showing of actual innocence.  The claim should be rejected.

9.      <u>Ineffective Assistance of Counsel</u>

Petitioner contends that his attorney rendered ineffective assistance by prohibiting from testifying at trial.  This claim was raised and denied by the state courts on habeas review.  In the last reasoned decision, the superior court rejected the petition with citation to <u>In re Dixon</u>, 41 Cal.2d 756, 759 (1953); <u>In re Harris</u>, 5 Cal.4th 813, 829-42 (1993); and <u>In re Waltreus</u>, 62 Cal.2d 218, 225 (1965).  (LD 19.)  The court found that the issues could have been raised on direct appeal, but were not, and therefore could not be raised on habeas corpus.  Respondent contends the claim is procedurally defaulted and without merit.  The Court agrees.

a.  <u>Procedural Default</u>

State courts may decline to review a claim based on a procedural default.  <u>Wainwright v. Sykes</u>, 433 U.S. 72, 86–87 (1977).  In turn, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is

independent of the federal question and adequate to support the judgment." <u>Coleman v.</u>

<u>Thompson</u>, 501 U.S. 722, 729 (1991); <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001);

<u>see</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1150

(2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner

has defaulted on the particular state's procedural requirements . . . ."). This concept has been

commonly referred to as the procedural default doctrine. This doctrine of procedural default is

based on concerns of comity and federalism. <u>Coleman</u>, 501 U.S. at 730-32. If the court finds an

independent and adequate state procedural ground, "federal habeas review is barred unless the

prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate

that the failure to consider the claims will result in a fundamental miscarriage of justice." <u>Noltie</u>

<u>v. Peterson</u>, 9 F.3d 802, 804-805 (9th Cir. 1993); <u>Coleman</u>, 501 U.S. at 750; Park, 202 F.3d at

1150.

  The mere occurrence, however, of a procedural default will not necessarily bar a federal

court from reviewing claims in a petition for writ of habeas corpus. In order for the procedural

default doctrine to apply and thereby bar federal review, the state court determination of default

must be grounded in state law that is both adequate to support the judgment and independent of

federal law. <u>Ylst</u>, 501 U.S. at 801; <u>Coleman</u>, 501 U.S. at 729-30. Put another way, the

procedural default doctrine will apply only if the application of the state procedural rule provides

"an adequate and independent state law basis" on which the state court can deny relief. <u>Park</u>, 202

F.3d at 1151 (quoting <u>Coleman</u>, 501 U.S. at 729-30).

  "For a state procedural rule to be 'independent,' the state law basis for the decision must

not be interwoven with federal law." <u>LaCrosse</u>, 244 F.3d at 704 (citing <u>Michigan v. Long</u>, 463

U.S. 1032, 1040-41 (1983)); <u>Morales v. Calderon</u>, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal

habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or

to be interwoven with federal law.'" (quoting <u>Coleman</u>, 501 U.S. at 735). "A state law is so

interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling

on federal law [such as] the determination of whether federal constitutional error has been

committed.'" <u>Park</u>, 202 F.3d at 1152 (quoting <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.") (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)). Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'" Id. at 377 (quoting Morales, 85 F.3d at 1392).

In re Dixon refers to California's procedural rule which provides that a California court, in a habeas corpus proceeding, will not review the merits of a claim if that claim could have been raised in a timely appeal but was not. In re Dixon, 41 Cal.2d at 759 ("[I]n the absence of special circumstances constituting an excuse for failure to employ [the] remedy [of direct review], the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction"). See In re Harris, 5 Cal.4th 813, 823 (1993) (explaining Dixon rule). Since the California Supreme Court's 1998 decision in In re Robbins, 18 Cal.4th 770, 811-812 & n. 32 (1998), the Dixon rule has been independent of federal law. Park, 202 F.3d at 1152. Since the California Supreme Court's 1993 decisions in In re Harris, 5 Cal.4th 813, 823 (1993) and In re Clark, 5 Cal.4th 750 (1993), the Dixon rule has been consistently applied, i.e., "adequate." Park, 202 F.3d at 1152. Hence, any state court ruling procedurally barring a habeas claim because the petition failed to raise that claim in his direct appeal, i.e., the Dixon rule, will be barred on federal habeas review unless the petitioner can demonstrate (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. Harris v. Reed, 489 U.S. 255, 262-263 (1989); Coleman, 501 U.S. at 750.

In this case, Petitioner raised the issue of counsel's ineffectiveness for prohibiting Petitioner from testifying on his own behalf by Marsden[4] motion to the trial court. (Doc. 47.) At the hearing, Petitioner complained that his attorney "didn't permit [him], the defendant, to testify

_____

[4] People v. Marsden, 2 Cal.3d 118 (1970). A Marsden motion is a motion to relieve counsel based on ineffective assistance.

. . . ." (Doc. 47 at 1016.) The Marsden motion was denied. (LD 10.) Thus, appellate counsel had a basis in the record on which to raise this claim on appeal. Since the claim could have been raised on appeal but was not, the state court properly imposed the Dixon procedural bar. At the time the bar was imposed, the rule was both adequate and independent of federal law. Petitioner fails to establish cause and prejudice, or that a fundamental miscarriage of justice occurred. Therefore, the claim is procedurally defaulted. Even so, as discussed below, the claim is without merit.

### b. Legal Standard

As previously set forth, claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Miller, 882 F.2d at 1433 (citing Strickland, 466 U.S. at 668). To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694.

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles, 556 U.S. at 122. Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro, 550 U.S. at 473; Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

### c. Analysis

The claim fails because the record shows counsel did not prevent or prohibit Petitioner from testifying. Rather, Petitioner voluntarily chose not to testify. The trial court inquired whether Petitioner and defense counsel had discussed if Petitioner intended to testify. (RT 861-62.) The trial court advised Petitioner he had a right to either testify or not to testify. (RT 862.)

Petitioner responded affirmatively that he had discussed the matter with his attorney.  (RT 862.)
A short recess was taken and Petitioner again discussed the matter with his attorney, whereupon
he advised the trial court that he had decided not to take the stand. (RT 862.)  In light of the
record, it is clear Petitioner made a conscious, voluntary decision not to testify after conferring
with his attorney.  (RT 862.)  There is no basis in fact for Petitioner's allegation that defense
counsel prevented him from testifying.

It is very likely counsel advised Petitioner not to testify, but this is vastly different from
Petitioner's allegation that counsel prohibited him from testifying.  As to counsel's advice,
Petitioner fails to demonstrate that it was so erroneous that counsel was no longer functioning as a
reasonable attorney.  Counsel's strategic decisions made after thorough investigation are virtually
unchallengeable.  Strickland, 466 U.S. at 690.  As noted by Respondent, defense counsel may
have been convinced that Petitioner's testimony could have been a gift to the prosecution.  Lord
v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) ("A witness who appears shifty or biased and
testifies to X may persuade the jury that not-X is true, and along the way cast doubt on every
other piece of evidence proffered by the lawyer who puts him on the stand.").  Thus, Petitioner
fails to meet his burden of showing that counsel was deficient or that his performance prejudiced
him.  The claim fails on the merits.

**IV.    RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be
DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge
assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the
Local Rules of Practice for the United States District Court, Eastern District of California.  Within
twenty-one days after being served with a copy of this Findings and Recommendation, any party
may file written objections with the Court and serve a copy on all parties.  Such a document
should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies
to the Objections shall be served and filed within ten court days (plus three days if served by
mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling

pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated:   __**February 12, 2018**__                  __**/s/ Jennifer L. Thurston**__
                                                    UNITED STATES MAGISTRATE JUDGE